MILLER CLARK v. THE STATE.

No. 1412. Decided April 13, 1898.

1. **Assault With Intent to Rape.**

An assault with intent to rape apprehends an intent on the part of the offender to use the utmost force to accomplish his purpose, and it is incumbent upon the State to establish this beyond a reasonable doubt.

2. **Same—Identification of Defendant by Prosecutrix—Testimony Corroborative of.**

On a trial for assault with intent to rape, it is not competent to prove by a third party witness, as original evidence, that on the day of the assault the prosecutrix has picked out and identified the defendant from a party of four men who were made to stand·in a row, that she might examine and select the guilty one. Such evidence is not admissible as original evidence, and it is only competent in rebuttal, after there has been an attempt to impeach the prosecutrix by showing that she had charged some other person than defendant with the crime, or that her testimony was recently fabricated, or that she had testified under the influence of improper motives. Such evidence does not become admissible on account of the fact that, on cross-examination, it was attempted to be proved by the prosecutrix that she was mistaken as to the identity of the party, nor does it become admissible from the fact that defendant had attempted to show by his evidence that the prosecutrix was assaulted by some other party. Following Reddick v. State, 35 Texas Criminal Reports, 463.

3. **Same—Evidence Insufficient.**

See the opinion for facts adduced on a trial for assault with intent to rape which the court hold are wholly. insufficient to support the judgment of conviction, notwithstanding the defendant had been three times found guilty by verdict of a jury.

APPEAL from the District Court of Kaufman. Tried below before Hon. J. E. DILLARD.

Appeal from a conviction for assault with intent to commit rape; penalty, two years imprisonment in the penitentiary.

This is the third appeal taken in this case. See Clark v. State, 33 S. W. Rep., 224; Clark v. State, 38 Texas Crim. Rep., 30.

The opinion states the case as presented on this appeal.

*Lee R. Stroud, George G. Shaw,* and *Gossett & Young,* for appellant.

*Cunningham & Adams, J. S. Woods, Nat P. Jackson,* and *Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of an assault with intent to rape, and his punishment assessed at confinement in the penitentiary for a term of two years; hence this appeal.

The State's case was predicated mainly on the testimony of the prosecutrix. Her testimony shows that about 9 o'clock on the morning of the

4th of September, 1895, she was awakened from sleep by some one hallooing. She arose from her bed, in the north room of the house (being a front room), walked into the adjoining front room, which is the southwest room, and opened the door to see where the hallooing was. She looked out, and saw a wagon drawn by two mules, with four men in it, then coming around the corner at the northeast end of the lane, which fronted her house. She merely observed that there were two men and two boys in the wagon, and did not notice any further. She immediately got her bonnet, and went to the lot, which was some 190 yards in the rear of the house. We give her language here as to what occurred, to wit: "I saw two men coming around my house on the south or west side, but I supposed they were friends or neighbors, and paid no further attention to them, but bridled the horse, and was in the act of buckling the throat-latch when one of the men grabbed me by the neck with his right hand, coming up behind me, and choked me until I could not halloo. The other man, who was the smaller one, caught hold of the bridle reins, and said, 'We'll help you hitch up.' I replied, 'I don't want to hitch up.' He replied, 'I guess you do.' The other one (Farmer) then took hold of my throat, choking me. He (Farmer) said to the smaller man (Clark), 'You go on, and I will be on after awhile;' and Clark then went off, out of sight, but I did not see where he went. He went towards the house, but I don't know where he went. Then Farmer put his hand on my breast, and around my waist, and took hold of my skirt, and raised it a little, and said, 'Damn you! I will get it directly.' Clark was then gone off somewhere. When Farmer said that, and took hold of my skirt, I jerked loose from him, and ran westward a little piece, just outside of the horse-lot gate; and he hallooed at me, and said, 'Stop.' I stopped, and he looked at me a little while, and started off. I then said, not intending for him to hear it, 'You will be sorry for this some day,' and he then said, 'I had better not be;' and he turned, and went on towards the house. After that I saw him no more. When they were gone I finished bridling the horse, and then caught the other horse, and harnessed both of them, and hitched them to the wagon and drove off to the gin of Ed La Roe, my husband's father. When I started to drive off, I went in a northeast direction; driving towards Jones Creek gate, across the pasture, as that was the way to the gin. When I had gone part of the way to Jones Creek, I saw my brother, Hugh Priddy, riding along on a pony. Can't say just where I overtook him. I went to the gin, and told Ed La Roe that I was assaulted by two men at my barn lot. I see the heavy-set man here in court. It is the defendant Joe Farmer, that assaulted me. There were bruises on my neck a day or two afterwards. I identified the two men, Farmer and Clark, on the evening of the day of the assault, in the tax collector's office, and pointed them out there in the crowd. Farmer wore no top shirt; had on a red leather belt; and Clark a dark striped shirt." Hugh Priddy, the prosecutrix's brother, was introduced, and testified that when he was in the pasture north of the horse lot of the prosecutrix, about 200 or 250 yards from the lot, he saw his sister and two men near her wagon;

saw two men walk away from near the wagon, one four or five steps ahead of the other; that she had her team hitched up at the time; that he was on his pony, and went on in the direction of the gin, towards the Jones Creek gate, and there his sister overtook him, and he opened the gate for her. This testimony was adduced in corroboration of the prosecutrix's testimony as to the occurrence at the lot. The State also introduced in evidence a plat of the house where the alleged assault is said to have occurred, and the surroundings, including the road and lane which passed the house; the same being the road from Canton to Kaufman, which map is as follows:

The State verified said map by a witness, and proved the various objects and distances as marked on the map.

In that connection it was also shown that, just previous to the time the alleged assault is said to have occurred, three wagons came in at the gate situated at the northeast corner of the lane, near the front of the La Roe house, and proceeded on their way down said lane, towards Kaufman. At the time they came into the lane, it was shown by the State, and also admitted by the defendant, that he and his codefendant, Farmer, and two boys, Hewitt Mathis and Lum Hines, were coming up the Canton and Kaufman road, on their way to Kaufman. When the three wagons entered the lane, according to the defendant's testimony, they were about 150 yards down the lane, in the direction of Canton. Some of the State's witnesses indicate that they were as far as 296 yards down that lane. The

State's witnesses show that said wagon, in which were the defendant and his companions, passed them at the southwest corner of said lane. · The three wagons proceeded leisurely down said lane, and said wagon passed them at the corner in a trot. It does not appear that the State's witnesses who were in the three wagons noticed the wagon in which appellant and his three companions were, after they entered the lane, when they first saw them, until it passed them, near the southeast corner of said lane, near the cotton house. The theory of the State was that said wagon, in which were appellant and his companions, stopped in the lane in front of the La Roe house; Clark and Farmer alighted therefrom, leaving the two boys, and then proceeded past the La Roe house to the horse lot, 190 yards, made the assault, returned to the wagon, and overtook the three wagons at the corner of the lane; the distance traveled by the wagon in overtaking the said three wagons being 580 varas. The theory of the appellant was that in the nature of things, it was a physical impossibility for him to have traveled in the wagon from the point where he was first seen by the State's witnesses, down the Canton road, to the front of the La Roe house, stop the wagon, and he and his codefendant alight therefrom, proceed to the lot, make the assault, return to the wagon, and then overtake the three preceding wagons at the corner or turn of said lane. This theory was strongly supported by experiments made by appellant on the ground with wagons driven under conditions as claimed by him, similar to those testified to by the State's witnesses concerning the transaction. It will be noted, in regard to these experiments made by the defendant, that they were made after due notice to the opposite party, and requesting the representatives of the State to participate in the same. This the State declined to do. Two of the private counsel, however, representing the State, were present when the defendant's experiments were made. Defendant also requested one of the State's witnesses (Jim Pollard) who had driven one of the three wagons on the occasion the assault is said to have occurred, to attend with his team and engage in the experiment. This he agreed to do if the State would consent. The State not consenting, he did not attend. The experiments were made by placing a wagon drawn by two mules in front of the La Roe house, near the gate, and then placing another wagon drawn by mules down the Canton road, and then having both wagons to move off simultaneously, the one leisurely down the lane towards Kaufman, and the other in a trot up the lane to the La Roe house, there stop, have the party driving to alight, and to proceed rapidly past the La Roe house, and to the lot, and remain there a time ranging from fifty-five seconds to two minutes, and then return rapidly to the wagon, get in, and drive in a trot down the lane towards Kaufman. On each occasion said wagon was not able to overtake the preceding wagon until near the front of the Deeds house, which is 410 varas beyond the mouth of the lane, at the southeast corner thereof. There were several of these experiments, and they were managed with particularity, and, so far as we are able to discover, with a desire to approximate as nearly as practicable to the evidence on the part of the State relating to the charge

against appellant. In rebuttal of this evidence, the State also introduced experiments. But it will be noted that these experiments were made without notice to the defendant or his counsel, and the parties who participated therein were, for the most part, relatives of the prosecutrix. Nor do these experiments appear to have been made with that requisite care required in a proceeding of this character. As a specimen of these experiments, we give the substance of the testimony of Ed La Roe, the father-in-law of the prosecutrix. He says one wagon was placed in front of the La Roe house, and another down the Canton road 296 yards, which he says one Dowdle pointed out as the place where he saw the wagon appellant was in when he drove into the lane on the occasion of the alleged assault. On the first experiment, he states, the wagons moved off simultaneously, and the rear wagon stopped in front of the La Roe house a short while (but he did not know how long), and then proceeded down the lane towards Kaufman, and that he did not see the point where it overtook the front wagon, but he was told that it was seventy-five yards short of the La Roe corner. On the next experiment the rear wagon overtook the front wagon fifty yards short of the corner of said lane. On the third test it overtook the front wagon at the corner. It will be noted that this witness does not state the length of time the wagons stopped in front of the gate, nor the rate of speed at which the rear wagon was driving; thus omitting a most material circumstance in the testimony. Anthony testified that he drove the rear wagon in making the test for the State, and that the front wagon was driven in a walk; that the wagon which he was in was driven in a fast trot; that they stopped in front of the La Roe house, he got out and proceeded to the lot, stayed there two minutes and fifteen seconds, returned to the wagon, and then proceeded down the lane in a fast trot, and overtook the front wagon at the corner of the Deeds lane. That is, according to his testimony, the front wagon was 296 yards in advance of him; was traveling in a walk, which some of the witnesses say was at the rate of four miles an hour; the rear wagon was going in a trot; defendant stopped in front of the La Roe house, while the witness Elliott proceeded 190 yards to the lot, remained there two and one-quarter minutes, and then returned to the wagon, and then, within a distance of 580 yards traveled, overtook the front wagon. Now, this we regard as pretty fast trotting. From the estimate we make, the rear wagon would have traveled 580 yards at the rate of from twelve to fifteen miles an hour, which would be a mile to every four or five minutes. As stated before, the experiments made by the State were not made with the same degree of particularity as those shown to have been made by the appellant. In addition to the above evidence of experiments made on the part of the appellant, we also have the evidence of the two boys who were with him in the wagon. They were strangers in that community, and were journeying from Van Zandt County to Kaufman, to engage in picking cotton. They were both shown to have borne a good reputation where they lived, and they both testified unequivocally that on that morning they made no halt at the La Roe house; that neither the defendant nor his codefendant,

Farmer, got out of the wagon at that point, but they proceeded on their journey, and overtook the three wagons shown by the State to have preceded them, at the mouth of the La Roe lane.

We have thus stated the essential features of the case, and the testimony supporting the theories of the State and the defendant, in order to discuss two questions: First, the sufficiency of the evidence to sustain the verdict; and second, the action of the court in admitting the testimony of the prosecutrix as to her identification of appellant and his codefendant at the tax collector's office on the evening the assault is alleged to have been made on her. We might say here that the State's case depends entirely upon the testimony of the prosecutrix as to the identification of the appellant and Farmer as being the parties who assaulted her; and, if she is mistaken as to this matter, the State's case wholly fails. In the first place, either she or her brother, Hugh Priddy, is mistaken as to the immediate conditions surrounding the occurrence. She testified that she had gone to the lot to take the horses to water; that she had barely reached there, and was placing the bridle on one of the horses, when she saw two men approaching, whom she afterwards recognized as appellant and Farmer; that Farmer laid hold of her, choked her, etc.; that Clark, on suggestion of Farmer, retired, and she presently got away from Farmer, and he left; she then caught the horses, harnessed them, and hitched them to the wagon, and then proceeded through the La Roe pasture to the gin where her husband was, some two miles distant. Her brother testified that he was going through the pasture at that time, towards the gin, and when some 200 or 250 yards distant from the lot he saw his sister, who then had her horses harnessed and hitched to the wagon, and at that time saw two men at the lot, and saw them leave her. This is entirely inconsistent with her testimony on this subject, and in our opinion it is a difference upon a very material matter; that is the situation of the parties and their immediate surroundings at the very time of the alleged assault. If she saw the men coming up the lane before she left the house to go to the lot, and she then had time to harness the horses and hitch them to the wagon before she was assaulted, this would very much enlarge the time, and render it still more difficult for the wagon in which appellant was to overtake the three wagons which preceded him, before they reached the mouth of the lane. And, moreover, if she is mistaken about this matter, and her brother is correct as to seeing her with the wagon hitched up, and the two men leaving her, and the assault occurred at that time, it would tend greatly to show that she was mistaken in identifying these parties as having made the assault on her  And Hugh Priddy seems to have been corroborated in this matter by the fact that although he was on horseback, and traveling in a trot on his pony, going the same route pursued by his sister, she overtook him at the Jones Creek gate, a distance of only 1200 yards. She would scarcely have had time, after the alleged assault had been made on her, to have harnessed and hitched the horses to the wagon, and then overtake her brother within that distance. So, if she was as-

saulted at the time Hugh Priddy saw the two men leaving her, the conclusion is almost irresistible that it could not have been the appellant. When we consider, in connection with this clash on the part of the State's witnesses upon this very vital issue, the mysterious character of this alleged assault, the fact that these parties were strangers in that community; that they were not acquainted with the environments of the premises, or who lived there; that they would alight from the wagon in broad daylight, when a number of houses were in close proximity, and in view of the wagons which had preceded them, and rush past the residence, to the lot, and assault a woman, with intent to rape her—before a conviction could be had under such circumstances we would ordinarily expect strong and convincing testimony. Instead thereof, as we have seen above, the State's own witnesses differ as to a vital point in the case. And in addition to this, taking the State's evidence as a basis, the testimony on the part of appellant as to experiments on the ground made under circumstances nearly approximating the evidence made by the State's case shows almost to an absolute certainty that appellant, and those with whom he was traveling, could not have done the acts attributed to him by the prosecutrix, and then return and overtake the preceding wagons at the mouth of the lane, within a distance of 580 varas.

In connection with this matter, we would further observe that the charge here is an assault with intent to rape, which apprehends an intent on the part of the appellant to use the utmost force to accomplish his purpose; and this it is incumbent on the part of the State to establish beyond a reasonable doubt. Do the circumstances narrated by the prosecutrix establish that it was the purpose of appellant, if it be conceded that he was present at the time of the assault, to aid or abet Farmer in having intercourse with the prosecutrix by force, and against her will? The testimony does not advise us of any understanding or agreement on his part with Farmer to go to the lot, and there ravish the prosecutrix. The most that can be said is that they appear there. Farmer lays violent hands on the prosecutrix. Clark (appellant) caught hold of the bridle reins, and told the prosecutrix he would help her hitch up, to which she replied that she did not want to hitch up. He said, "I guess you do." Farmer told Clark to go on, and he would come after awhile, and Clark (appellant) left, and appeared no more on the scene. Farmer himself, it seems, remained longer, and subsequently took hold of the prosecutrix's skirt, raised it a little, and said, "Damn you! I will get it directly." But the prosecutrix says that Clark was not present at that time, and so could not have participated in this part of the transaction. Now, can it be said that Clark intended to aid Farmer in committing a rape on the prosecutrix? Evidently it was a peculiar way to assist in committing a rape— to leave the party whom he was expected to assist, and at the very time when, if he had to accomplish his purpose by force, he would need his assistance. We can not conceive in what manner he was intending to aid in the accomplishment of an outrage of the character charged, and we

can not regard the evidence in this respect as establishing that the appellant intended to aid or abet Farmer in using that ulterior force necessary to accomplish rape.

On the trial the State was permitted to prove by the witness G. E. Chilcoat, justice of the peace of Kaufman precinct, that on the evening of the day of the alleged assault J. J. Farmer, appellant (Miller Clark), Lum Hines and Hewitt Mathis, who had previously been arrested, were taken to the tax collector's office, and there stood up in a row together; that said Chilcoat told the witness Jessie La Roe, on the streets, that some men had been arrested, supposed to be the parties who committed the assault, and that he wanted her to come and identify them; that he admonished her to be careful; that Chilcoat took her in the room of the tax collector, where the prisoners were; had the door closed; the parties were required to stand close up, and no one else stood up, or was placed with them, though there were several other persons in the room at the time, but not standing in line with the prisoners; that the prosecutrix, Jessie La Roe, looked at the prisoners, and then requested that they turn their backs, which they did; and then, after she looked at them a little while, selected J. J. Farmer and Miller Clark, out of the four, as being the parties who committed the assault. To the admission of this testimony the defendant objected on the ground that said identification was ex parte, and not sworn to; was in the nature of hearsay testimony, and unfair, in that no parties other than the two men, Clark and Farmer, and the two boys, Lum Hines and Hewitt Mathis, were selected, and stood alone, and not placed in a crowd of strangers, for the said prosecutrix, to see whether they could be selected from a crowd by her. Said testimony was admitted over the objections of appellant. The court explained said bill of exceptions by the statement that Mrs. Jessie La Roe on her cross-examination was asked many questions tending to show that she was mistaken in her identity of defendants, and also tending to impeach her as a witness, and because defendant had endeavored to show that Mrs. La Roe had been assaulted by parties other than defendant Miller Clark, who was traveling with a wagon on the Canton and Kaufman road, towards the town of Kaufman. Was this testimony legitimate? In Reddick v. State, 35 Texas Criminal Reports, 463, we laid down the rule under which this character of testimony could be admitted. We there held that the prosecutrix in a rape case stands on precisely the same ground as any other witness, except that, recently after the alleged outrage, it could be shown she made complaint thereof, without giving the particulars. If the defendant had attempted to impeach her by showing that she had charged some other person than the appellant with the crime, or that her testimony was recently fabricated, or that she testified under the influence of improper motives, it would have been competent for the State to show that recently after the transaction she identified appellant as the party who committed the alleged outrage upon her. This, not as original testimony, but in rebuttal of the attempt to impeach her. Now, does the fact, as certified by the court, that said witness on

cross-examination was asked many questions tending to show that she was mistaken in her identification of appellant, and also tending to impeach her as a witness, bring the case within the above category? It was perfectly competent for the appellant, on cross-examination, to rigidly examine her as to her identification of the defendant as being the guilty party; and also to propound questions to her tending to impeach her as a witness; but we are not informed of the character of these questions, or how they were answered. If she admitted on her cross-examination that she had charged the crime upon other persons, or if her answers showed that they were recently fabricated, and under the influence of improper motives, the learned judge in his explanation should have stated these matters; and then it would have been entirely competent, on her re-examination, to prove by her, or by any other witness, that she identified the appellant as one of the parties who assaulted her, recently after the transaction, and when there was no inducement for her to fabricate. This, however, was not done, and if we recur to the statement of facts, we there find that this evidence complained of was adduced by the State as original testimony, and not in rebuttal of any attack made on the witness of the character above indicated. Of course such testimony could not be competent because defendant, by his evidence, endeavored to show that Mrs. La Roe had been assaulted by other parties than the defendant, Miller Clark; and we fail to see the purpose of the judge in adding this as a reason why he permitted said testimony. We hold, under the circumstances of this case, that this evidence was inadmissible. That it was material can not be gainsaid. If it be even conceded that the testimony, when viewed as a whole, was sufficient to sustain the verdict on the question of identity, the most that can be said of it would be that the case hung in equipoise, upon very delicate scales, and the least bit of illegal testimony was calculated to prove injurious to appellant before the jury. We have heretofore discussed the evidence regarding identity, and will not here reiterate it. Suffice it that this character of testimony, in our opinion, was calculated to materially impress the jury with the idea that appellant must be the man, as she identified him and picked him out from among others recently after the occurrence.

We do not deem it necessary to discuss the questions raised in overruling the appellant's motion for a change of venue. We would state, however, that appellant presented very strong reasons tending to show that the venue should have been changed.

This is the third appeal in this case from a conviction in the lower court. 33 S. W. 224; 38 Texas Crim. Rep., 30. While we are willing to concede much to the verdict of a jury, yet we are fully aware how a charge of this character is calculated to inflame the minds of a community, and even unconsciously enter the jury box. We have therefore been the more careful to give this record a critical and thorough examination, having in view the security of the citizen, as well as the protection of society, which in our judgment go hand in hand; and, bearing also in mind

the full measure of responsibility cast upon us, we can not lend the sanction of our approval to the verdict of the jury. The judgment of the lower court is accordingly reversed, and the cause remanded.

*Reversed and remanded.*