MILLER CLARK v. THE STATE.

No. 1165. Decided June 9, 1897.

**1. Continuance—Diligence—New Trial—Materiality.**

It is the duty of a defendant, when his witness is not present at the beginning of the term in obedience to the subpoena which was served upon him, to apply for and have an attachment issued for said witness; and a failure to do so will defeat his right to a continuance for want of diligence. But, on motion for new trial, notwithstanding such want of diligence, if the testimony is both material and probably true, a new trial should be granted to give defendant an opportunity to procure the testimony.

**2. Assault with Intent to Rape—Defendant as a Witness—Impeachment of by Proof of Other Similar Crimes.**

On a trial for assault with intent to rape, where defendant has testified as a witness in his own behalf, he may, on cross-examination, be asked if he has not been previously indicted for a similar offense.

**3. Same—Experiment Evidence.**

Where experiments as to any disputed fact testified to at the trial appear to have been made under conditions similar or nearly similar to those which attended the original transaction, and where such experiments would tend to shed any light upon said original transaction, proof of the results of the same is legitimate and admissible as evidence. Such results are not conclusive, but are mere circumstances to be considered with the other evidence in the case, and are to be weighed and determined by the jury.

**4. Same—Identity of and Corroboration of Defendant as a Witness.**

See opinion for facts stated, on a trial for assault with intent to rape, upon which it is held, that experiments made for defendant, after the alleged transaction, were admissible as to the identity of defendant and in corroboration of defendant's testimony.

APPEAL from the District Court of Kaufman. Tried below before Hon. J. E. DILLARD.

Appeal from a conviction for assault with intent to rape; penalty, two years imprisonment in the penitentiary. This is a companion case to Farmer v. State, 35 Texas Crim. Rep., 270.

Mrs. Jennie Laroe was the alleged injured party. The testimony of this prosecutrix, summarized, is to the effect that she was awakened from a sleep into which she had fallen by loud voices, cursing and hallooing, between 8 and 9 o'clock on the morning alleged in the indictment. Passing into the front room of her house she saw a two-mule wagon turn into the lane leading to her house. That wagon contained four persons. She saw no other wagons so far as disclosed by this record. From the front room she went to the horse lot to water her horses. When she had chased one of the horses around the lot twice and caught and was bridling him, two men she had not previously seen approached her. One of these men seized her by the throat. That man she subsequently identified as Farmer, jointly indicted with appellant. At the same time the other man, whom she positively identified as appellant, seized the bridle on her horse, and said, "we will help you gear up." The witness testified that she had never seen either of the men before. According to this witness, Farmer, while appellant was holding her horse, retained his clutch upon her throat and placed his hand on her person, and said, resisting her efforts to repulse him, "damn you, I will get it directly." After she had released herself from the grasp of Farmer, appellant said to Farmer, "you go away, and I will be on after awhile." The parties left and witness left, with her throat and neck badly scratched. She did not see the men get out of the wagon, nor get in again, nor did she see the wagon start.

The following plat of the locus in quo, prepared by W. H. Barnes, a surveyor, and identified as correct, was introduced in evidence by the defendant and used by the witnesses on the trial:

Distances.—From point in front of house to the house is 90 varas; from house to horse lot is 100 varas. From corner of Laroe lane up north of house or northeast of house down to middle of lane is 340 varas. From point in front of house down to turn of lane near Deed's is 580 varas. From point in front of house to horse lot is 190 varas. From point in front of house in center of lane up to big gate is 200 varas. From middle of Laroe lane up to corner of same nearest Laroe house is 340 varas. From big gate to ravine in Canton road is 650 varas.

It was shown by the State that there were three wagons belonging to Dowdle and Pollards coming out at the gate about 200 yards east of the Laroe premises while defendant's wagon was coming up the Canton and Kaufman road about 150 yards southeast from said three wagons. That the Laroe lane from the gate to Deed's corner on the Kaufman and Canton road is 780 varas. From the point in lane in front of Laroe house to the house is 90 varas. That the parties were at the house sometime making an assault. That defendants' wagon passed the three wagons at or before reaching Deed's corner, which is 580 varas from the point in lane in front of house down Laroe lane towards Kaufman. That in order for defendants to be the guilty parties they must have traveled the 150 yards they were behind the three wagons at gate aforesaid, gone up the Laroe lane in front of house 200 yards, stopped their wagons, gone to the horse lot of prosecutrix on an open prairie 190 yards from the road, gone back to the wagon 190 yards, and then to catch up with

the Pollard and Dowdle wagons from the point in front of the house in lane. Proof showed that the Pollard and Dowdle wagons went in good fast walk down said lane, and that they trotted down a slant a part of the way and did not stop anywhere in the lane.

Roy and Lizzie Singleton were picking cotton in a field about the middle of Laroe lane, and saw the Pollard and Dowdle wagons, and saw defendants' wagon. Defendants' wagon drove in a slow trot down the lane and passed the hindmost of the Pollard and Dowdle wagons a little west of the middle of the lane.

The court refused to permit the defendant to prove by several witnesses, introduced by him for that purpose, the following facts, viz: That about ten days before the trial of this case, the said witnesses last named went upon the ground of the alleged assault with wagons and mule teams, and by three successive drives, fairly made by proper and disinterested persons, under the same manner and conditions that the evidence showed defendants' and the Pollard and Dowdle wagons were, and put to an actual test whether it was possible, by giving the State the benefit of all doubtful points, for defendants to have assaulted Jessie Laroe, as she testified, at the barn lot, and to have overtaken the Pollard and Dowdle wagons at the same point in the lane where all the State's witnesses say defendants' wagon did overtake them, and thereby show that it was by far impossible, and so far impossible as to demonstrate, in the light of all the evidence, that the defendants could not possibly be the guilty persons.

*Lee R. Stroud, G. G. Shaw,* and *Gossett & Young,* for appellant, filed an able and interesting brief.

*Nat P. Jackson* and *Mann Trice,* Assistant Attorney-General, for the State, also filed an able and interesting brief.

HENDERSON, JUDGE.—Appellant was convicted of assault with intent to rape, and given two years in the penitentiary, and appeals.

Appellant made a motion for a change of venue on the ground that there existed in Kaufman County so great a prejudice against the defendant that he could not get a fair and impartial trial, and also on the ground that there was a dangerous combination against him in said county, instigated by influential persons. This application was contested by the State, and the court heard testimony pro and con in regard thereto, and overruled same. We see no error in this action of the court.

Appellant made a motion for a continuance on account of the absence of one John Ross. It appears that this witness was formerly under subpœna, but had been absent from the county prior to the beginning of the September term, 1896, of the District Court, for several weeks; and the application itself tends to show that he had removed to Limestone county, though this information does not appear to have been

known to the appellant until about an hour before the application for continuance was made. It was the duty of appellant, if said witness was not present on the first Monday in September, 1896, in obedience to the subpœna, to have applied for, and had issued, an attachment. He does not appear to have applied for, and had issued, any process for said witness until the 21st of September, and then process was issued to Hunt County. Appellant attempts to excuse himself for his want of knowledge as to the removal of said witness from Kaufman County on the ground that he lived remote from where said witnesss had formerly lived in Kaufman County; but this fact would certainly not relieve him, when the term of court began, and said witness was not then present. No diligence whatever is shown until the 21st of September, and then process was issued to the wrong county, the witness not being in Hunt County. It appears from the explanation of the judge that one George Deeds, who was a witness for the defendant, lived in the neighborhood where John Ross did, and that, by application to this witness, appellant might have found out about the removal of John Ross to Limestone County. The diligence which appears to have been exercised by defendant as to the witness John Ross was not sufficient. Appellant says he expected to prove by said absent witness that on the day of the alleged offense he was picking cotton near the house where the outrage is alleged to have occurred, and one end of the cotton rows on which he was picking came up to the lane; that a part of the State's case consisted in identifying the time of the occurrence by some three wagons passing along the Laroe lane, just ahead of the wagon in which appellant was riding, which, it is alleged, stopped in front of the Laroe house, and, after the commission of the offense, overtook the three wagons near the further end of the lane. Now, by this witness it was expected to be proved that, as he was picking cotton near that lane, he was in such a position that he would have seen said wagons if they had passed there at any time that morning, up to about 10 o'clock, and that he did not see them pass; that witness saw two men go to the house of the prosecutrix that morning, but saw no wagons in the lane at the time. The theory of the defendant was that the alleged assault, if it occurred, was made on the prosecutrix by some other persons than defendant and his codefendant, and that said parties did not come to the place in a wagon, as insisted on by the State, and that said parties could not have alighted from defendant's wagon and committed the act, because said wagon passed down the lane in front of the house of prosecutrix, just behind three other wagons. So it occurs to us that the alleged testimony of the absent witness was material, and, in the light of the other testimony in the case, we can not say that same was not probably true; and, although due diligence was not used in suing out process for said witness, yet, when the matter was presented in a motion for a new trial, we believe it should have been granted to give defendant an opportunity to procure this absent testimony.

There was no error on the part of the court in admitting testimony showing that appellant had been formerly indicted for a similar offense to that charged in this case. The question, "If he had not been into a scrape of this kind before?" was perhaps improper, but the proof elicited the fact from him that he had been previously indicted and acquitted on a charge of assault with intent to rape. This was admissible evidence, going to his credit as a witness.

Appellant presented a lengthy bill of exceptions to the action of the court in refusing to allow him to make proof of certain experiments made by him, by driving wagons along said Laroe lane, and past the house where the outrage is said to have been committed; said experiments having been made for the purpose, as claimed by defendant, of testing whether or not the wagon in which the appellant and his codefendant were (situated as they were with reference to the three wagons that preceded them, this wagon being some 150 yards in the rear of the hindmost of said three wagons, going at the rate they were at the time, as shown by the State's witnesses) could stop at the Laroe house, and the defendants could get out of their said wagon, and hurriedly go to the Laroe house, some 90 yards, and thence around said house to the Laroe lot, some 100 yards, then commit the assault on the prosecutrix, and rapidly return to their said wagon, get into it, and proceed rapidly up said Laroe lane towards Kaufman, and overtake the preceding three wagons at the further end of said lane, said lane being about 680 yards long. The bill of exceptions shows the character of the testimony upon this phase of the case to have been substantially to the effect that said experiments were made after a careful survey and plat of the ground had been made by competent persons; that the State was solicited by the defendant to join in said experiments and declined. Appellant showed that the State's evidence upon this branch of the case was to the effect: That the road from Canton to Kaufman passed by the house of the prosecutrix. That at that point there was a lane. The lane elbowed, going from Canton towards Kaufman, nearly in front of said house, and turned then in a southerly direction, and pursued said direction 680 yards; then again elbowed, and proceeded in a northwesterly direction. That on the morning of the alleged outrage, about 9 o'clock, prosecutrix was at her home alone, and asleep. That she heard persons holloing, near the turn of the lane in the direction of Canton, which awoke her. That she got up, opened the front door, looked out in front, and saw four persons in a wagon, driving mules, coming around said corner at the northeast end of the Laroe lane. That she closed the door, walked through the house, and thence in a northwesterly direction to the horse lot, some 100 yards to the rear of the house. She walked at her usual rate, got a bridle, and was at the lot, attempting to bridle a horse, and, while so doing, saw two men come around the house in a walk. That she continued endeavoring to bridle the horse, thinking the parties were neighbors, and while her back was turned to them the heaviest of the two men (who was identified as Farmer, the codefendant of appellant) grasped

her around the back and side of the neck, and with his hands choked her until she could not hollo. That the slimmest man (who was identified as appellant) took hold of the bridle and said, "We will help you hitch up," and she replied, "I don't want to hitch up." That the other man then put his hands on her breast, and slipped them down to and around her waist, and held her with one hand while he placed the other near the bottom of her dress, and raised her dress a few inches and said, "Damn your soul, I will get it directly," and that she then jerked loose from him, and ran outside of the horse lot, on the west side, and the fleshy man holloed to her to stop. As she stopped and looked around, that he turned and started off towards the house in a walk, and she said, "You will be sorry for this some day," and he remarked, "I had better not be sorry." That the two men then went off in the direction of the house, in a walk. She further testified in this connection that, while the fleshy man was holding her, he told the slim man to go off, and he did so, and she did not see him any more. The bill also shows that the two men got in their wagon, and proceeded rapidly down said lane, and overtook the three wagons, which were driving slowly down said lane, about the time they reached the southwestern elbow of the lane. Now, the appellant proposed to show that he made three experiments on the ground: First, he had a wagon, with common farm mules and driver, placed at a point in the lane near the Laroe house, and going in the direction of Kaufman. Then he had another wagon, with good, pert mules, and four men in it, placed down said lane towards Canton, 150 yards in the rear of said first wagon. Said wagons were started simultaneously, the first one in a medium walk, down the lane towards Kaufman; the rear wagon being driven partly in a walk and partly in a trot to the Laroe house, and then proceeded in a medium fast trot on down the lane, and, when it arrived at the middle of said lane, it was 75 yards behind the foremost wagon, and overtook the front wagon 139 yards before reaching the southwest end of the lane. The second experiment was with the same two wagons, placed as in the first experiment. They were started simultaneously, the front wagon proceeding down the lane in a medium walk. The rear wagon started in a fast walk, and, when it got to the east end of the lane, proceeded in a fast trot until it got right in front of the Laroe house, when two men jumped out of said wagon, and went in a fast walk to said Laroe house, 90 yards distant; and then in a fast run to the horse lot, 100 yards further, where the alleged assault is said to have been committed, and stood there two minutes by the watch; and a considerable time before the two minutes had expired, and while they were still standing there, the other wagon, in a medium slow walk, had traveled out of the Laroe lane, and turned the elbow at the southwest corner thereof, and stopped there considerable time. At the third experiment the two wagons were placed in the same position as before, and started simultaneously down the road. The front wagon proceeded in a slow walk, and continued that way through the entire lane, without stopping, and passed the southwest corner, and then pro-

ceeded on down the Deeds lane. In the meantime the rear wagon, having four men in it, drove in a fast trot to a point in the lane in front of the Laroe house, and then two of the men jumped out, and in a fast walk went to the Laroe house, and then ran full speed to the lot, and stood there 55 seconds, and then ran full speed back to the wagon, and got in it. At that time the front wagon had already passed the southwest corner of the Laroe lane, and was driving on towards Kaufman down the Deeds lane. That the rear wagon then pursued, the mules running as fast as they could, and overtook the front wagon at a point a quarter of a mile past the southwest corner of the Laroe lane, in the direction of Kaufman. That the front wagon in the meantime was driven in a slow walk. All this testimony was objected to on the ground that it was fabricated, and was excluded by the court. As stated, the bill of exceptions shows that it was proved by the State's witnesses that, at the time of the alleged assault with intent to rape, Dawdle and the Pollards came into the Laroe lane at a gate at the northeast elbow of said lane, and near the front of the Laroe house; that when these three wagons came into said lane the defendant, in a fourth wagon, was coming up the Canton and Kaufman road, about 150 yards from them; that said three front wagons pursued their route at a walking gait down the Laroe lane, and trotted a little when they got about the center of the lane, in the swag; that the rear wagon, in which was the defendant, followed and passed said wagons at the southwest elbow of said lane. The object of the excluded testimony, as disclosed by the bill of exceptions, was to show that, in the nature of things, it was impossible for the rear wagon, in which was the defendant (being only 150 yards distant from the front wagons, in which Dawdle and the Pollards were), when they entered the lane through said gate, to stop in front of said Laroe house, and the defendant and his codefendant to get out of said wagon, and go rapidly past the house, and to the lot, a distance of 190 yards, and then return and get in their wagon, and then proceed in a fast trot and overtake said front wagons at the southwest elbow of said lane, a distance of some 600 yards from the Laroe house. We would note the fact right here that the bill shows that the testimony as to the coming into the lane of said three wagons, the relative positions of said three wagons, and the wagon in which the defendant was traveling, was elicited by the State. By reference to the statements of facts, this testimony was brought out by the defendant, and not by the State. However, the bill of exceptions having been approved by the judge in this shape, we must be governed by it. But, in the view we take of the question, it makes no difference whether this testimony was developed by the State or the defendant. If the testimony of the experiments made is admissible at all, it is equally admissible whether the testimony showing the relative position of said wagons was brought out by the State or the defendant. It will be noted that the representatives of the State were invited by appellant to be present at said experiments, and it will be further noted that it was proposed to prove these experiments by a number of witnesses, and that there were three differ-

ent experiments made; the endeavor of appellant evidently being to make the experiment under several different conditions, so as to meet any phase of case that might be developed by the evidence as to this matter.

There are some difficulties attending the admission of this character of evidence. In the first place, in making an experiment some difficulty will be encountered in making it under the same conditions surrounding the original transaction, but it does not occur to us that that should be a reason why this character of testimony should be excluded. Of course, if the evidence regarding an experiment showed one made under circumstances and surroundings so dissimilar to the original transaction as that it would not shed any light upon it, there would be no error in its exclusion. See State v. Fletcher (Ore.), 33 Pac. Rep., 575. But if the evidence shows that the experiment was made under circircumstances similar, or approximately similar, to those which surround the original transaction, and such experiment would serve to shed any light upon that transaction, we can see no reason for the exclusion of such experiment, although it might not have been made under exactly similar conditions as attended the original transaction. The dissimilarity would not exclude, but would go its weight before the jury. Another difficulty in connection with such testimony is that evidence of experiments made are collateral in their nature, and are liable to consume the time of the court in a trial of such collateral issues. It has been held, on this account, that the court will not stop a case in order that an experiment be made. People v. Levine, 85 Cal., 39, 22 Pac. Rep., 969, and 24 Pac. Rep., 631. And it has been urged, as it is urged in this case, that the evidence was properly excluded; that such evidence is not admissible, on account of the danger of fabrication. But, in our opinion, this furnishes no good reason for its exclusion. All evidence, we might say, can, under circumstances, be fabricated; but the liability of fabrication rarely, if ever, alone, furnishes a good reason for the exclusion of evidence. Upon principle and authority, this character of testimony, where the experiment appears to have been made under conditions similar, or nearly similar, to those which attended the original transaction, and where such experiments would tend to shed any light upon said original transaction, is admissible. See Wilson v. State (Tex. Crim. App.), 36 S. W. Rep., 587; People v. Levine, 85 Cal., 39, 22 Pac. Rep., 969, and 24 Pac. Rep., 631. In the latter case, which was a case of arson, and in which an experiment was made with candles to ascertain how long they would burn, proof of the experiment was admitted; and the court, in passing upon the question, use the following language: "The proof of the result of experiments was equally as open to the defendant as the prosecution, and, if other experiments would have shown a different result from that shown by the experiment proved by the prosecution, the defendant had ample opportunity to show the fact. The books are full of authorities sustaining the court in admitting evidence of the result of experiments in chem-

istry, in toxicology, and particularly in the use of firearms, for purposes similar to that for which this evidence was admitted. It has been quite a common thing in cases of homicide, to make experiments with fire-ars, to determine the carrying distance, the penetrating force, and the distance to which fire will be carried by firearms of certain pattern and caliber, and to prove the results of such experiments at the trial, as tending to show the guilt or innocence of the accused. The experiment in this case was one of a similar character, and for a similar purpose. Its result was not conclusive, but a mere circumstance to be considered in connection with the other evidence in the cause. It was both competent and admissible. Its weight was for the jury to determine. We can not agree with counsel that it was the 'material and effective' evidence in the cause. The material and effective evidence on that branch of the case was the substantive fact of the candles themselves, and the condition in which they were found. They and the coal oil, with their surroundings, were tangible things, rendering it certain that the fire was incendiary; and the proof in relation to them, independent of any proof of the result of experiment, was 'the material and effective' proof in the case."

Now, as heretofore stated, the evidence in this case of the experiments made was threefold, and it appears that it was the endeavor of appellant to make the experiments as nearly as practicable under the same conditions attending the original transaction. The proof shows: That appellant, with three other persons, was driving a wagon drawn by two mules. They were preceded at the point in question by three other wagons drawn by mules, which came into the lane at the gate, some 150 yards in advance of them, and proceeded down the Laroe lane. That the front wagons passed down said lane at a moderate walk, perhaps trotting a little near the center of the lane. The rear wagon, in which was the defendant, followed at a faster gait, trotting most of the way, and passed the other wagons at the southwest corner of said Laroe lane; the front wagons, from the time they came into the lane at the gate, having traveled about 680 yards, and the rear wagon, in which was the defendant, having in the meantime traveled about 830 yards. Upon this state of case, the theory of appellant was that it was improbable, in the nature of things, for the wagon in which he was traveling to have stopped at the Laroe house, and for appellant and his codefendant to have then alighted, and gone a distance of 190 yards, committed an assault with intent to rape upon prosecutrix, and then returned to their wagon, got in it, and proceeded down the Laroe lane, and overtaken said three front wagons at the corner thereof. In order to show the improbability that defendant could have stopped his wagon in front of the Laroe house, got out, committed the assault, and returned to his wagon, got in, and overtaken the front wagons, he made the experiments which he offered in evidence, and it occurs to us that said testimony ought not to have been excluded. The prosecutrix alone identified defendant and his codefendant as the persons making the assault upon her. Appellant testified on

his own behalf, and denied this. Now, it stands to reason that if it be true, as the witnesses who were in the front wagons testified, that they came into the gate that entered the Laroe lane about 150 yards in advance of appellant in his wagon, and that they proceeded down said Laroe lane, and that appellant and his comrades in their wagon passed them at the southwest corner of said Laroe lane, 680 yards from where they entered it, and if it be further true that it would be impossible for appellant to stop on his way at the Laroe house, and go a distance of 190 yards, and there commit an assault on the prosecutrix and return to his wagon, and resume his journey at the fastest gait his mules could travel, and overtake the front wagons at the corner of said lane, then it is demonstrated that the prosecutrix was mistaken as to her identification, and that he was not the party who assaulted her. Or if this experiment, made under similar or nearly similar conditions, renders it improbable that he could, with his team, have stopped at said house, made the assault, then resumed his journey, and have overtaken the front wagons at the southwest elbow of said lane, traveling at the most rapid rate, then it occurs to us that such testimony was admissible as tending to show that the prosecutrix was mistaken in identifying him as the party who perpetrated the outrage upon her, and he was entitled to have such testimony, in order to corroborate and support his own evidence. To our minds, nothing is clearer than this, and because the court improperly excluded this testimony the judgment is reversed and the cause remanded.

*Reversed and remanded.*