Argued April 18, affirmed July 11, petition for rehearing denied
September 6, 1956, appeal dismissed, U. S. Supreme Court,
June 24, 1957

# STATE *v.* SACK
300 P. 2d 427

*John P. Hannon,* of Portland, argued the cause and filed a brief for appellant.

*J. Raymond Carskadon,* Special Deputy District Attorney for Multnomah County, argued the cause for respondent. On the brief were Robert Y. Thornton, Attorney General for the State of Oregon, and William M. Langley, District Attorney for Multnomah County.

Before WARNER, Chief Justice, and TOOZE, ROSSMAN, LUSK, BRAND and PERRY, Justices.

BRAND, J.

The defendant George Frank Sack was accused by indictment of the crime of murder in the first degree under the provisions of ORS 163.010. Upon trial by a jury he was found guilty as charged in the indictment and sentenced to death. Defendant appeals. The indictment, so far as material, reads as follows:

"GEORGE F. SACK is accused by the Grand Jury of the County of Multnomah and State of Oregon, by this indictment of the crime of

MURDER IN THE FIRST DEGREE
committed as follows:

"The said GEORGE F. SACK on the 16th day of February A.D. 1954, in the County of Multnomah and State of Oregon, then and there being, did then and there unlawfully and feloniously, purposely, and of deliberate and premeditated malice, kill one Goldie Sack by placing her in a closed trunk compartment of an automobile whereby she was asphyxiated, contrary to the Statutes", etc.

By his 25th and last assignment of error the defendant asserts that the court erred in denying his motion for a directed verdict. The grounds specified in the motion may be summarized as follows:

1. No proof of venue.
2. No proof of the corpus delicti.
3. No evidence connecting defendant with the crime.
4. No evidence that the deceased Goldie Sack was in the car or was unconscious.

The evidence of guilt was circumstantial. The commission of the crime by the defendant may be lawfully established by circumstantial evidence alone but the burden is upon the state to present satisfactory evidence with proof beyond reasonable doubt, and we recognize that such evidence must meet the test set forth in *State v. Dennis*, 177 Or 73, 159 P2d 838, 161 P2d 670, and cases there cited. However, we must also be guided by the rule that a motion for directed verdict is in the nature of a demurrer to the evidence. It admits the truth of the evidence as disclosed by the record "and every reasonable inference that might be drawn therefrom." *State v. Rosser*, 162 Or 293, 340, 86 P 2d 441, 87 P2d 783, 91 P2d 295; *State v. Dennis*, supra; *State v. Hansen*, 195 Or 169, 194, 244 P2d 990.

We proceed to a consideration of the evidence. We will first consider the evidence bearing upon motive, for though the existence of motive is not indispensable to conviction, such proof is of "great importance" in cases depending on circumstantial evidence. *State v. Hembrie*, 54 Or 463, 103 P 1008; *State v. Hansen*, supra.

Mrs. Goldie Sack came to Portland in the summer of 1952 and married the defendant in September

of that year. She died in February, 1954. Defendant's brief concedes that there was "some evidence of two quarrels, one in the Spring of 1953 and another in early August of the same year", but asserts that after that time there was no evidence of any quarreling. Defendant was the owner and operator of the Gordon Court apartments at 1626 S. W. Montgomery street, Portland, Oregon.

Maralyn K. Billie, prior to July 1, 1953, lived at the Gordon Court apartments, immediately over the apartment of the defendant and his wife Goldie. At about the end of February, 1953, the witness Billie heard and recognized the voices of defendant and Goldie. She heard sounds of a scuffle and heard Goldie screaming, "then she yelled, 'Don't hit me again.'" The witness added that she also heard "frequent quarreling."

Witness Mrs. Minnie McFarland had known Goldie since about 1929 in Great Falls, Montana, where they both were teachers. She had known Goldie and the defendant from the time of their marriage until Goldie's death, and saw them frequently. She testified that they got along "very badly." "They quarreled frequently." Witness testified to a quarrel at her home in early November, 1953. There was no cross examination. Witness Mrs. L. Bazzel was an old friend of Goldie. She met the defendant soon after the marriage in September, 1952. She saw them often and they had frequent quarrels. One serious quarrel was about a law suit, but the answer was stricken "for the time." There was no cross examination. Miss Elsie Bloom had known Goldie for eight years and was also acquainted with the defendant. She testified that in late February, 1953, Goldie spent the night at the home of the witness. The defendant came to the

house in an excited condition and said the witness was "harboring his wife."

Another witness, Miss Ethel Johnston, who lived with Miss Bloom, testified that defendant came to the door when Goldie was at the house. He rang the bell and inquired if his wife was there. Miss Bloom said "yes", and he said, "I can make it hot for you for harboring my wife."

The financial condition and activities of the defendant are relevant on the issue of motive and animus. Defendant and his wife had a joint account in the United States National Bank, but it was closed prior to 16 February 1954. On 16 February 1954 defendant had over $1,800 in his individual checking account in the United States National Bank. In the same bank he had a savings account of nearly $900. In the Portland Federal Savings he had over $800. In the Oregon Mutual he had over $1,000. The reasonable value of defendant's apartment house was $115,000. Goldie Sack's estate was valued at $15,900.

The record, as demonstrated by the applications for United States Savings Bonds, shows that Goldie Sack at various times purchased bonds for herself and the defendant as co-owners. The first purchase was on 16 February 1953 for two bonds numbered respectively C 202 753 106 E and R 10 466 070 E, totaling $225. The application was signed Mrs. Geo. F. Sack. On 8 August 1953 she purchased a bond numbered D 309 190 15 E for $375. The application was signed Mrs. Sack and her receipt for the bond was signed Mrs. Sack. On 3 September 1953 she purchased bond D 30919219E. The application and the receipt for the bond were signed Mrs. Geo. F. Sack. The bond was for $375. On 16 September 1953 she purchased and acknowledged the receipt of one bond num-

bered C 204 212 550 E, signing Mrs. Geo. F. Sack. The bond was for $75. On 22 September 1953 she purchased one bond, C 204212565 E. The application was signed Mrs. Geo. F. Sack and the receipt was signed Goldie Sack. The bond was for $75. On 12 October 1953 she purchased one bond numbered D 30919086 E, signing the application Mrs. Geo. F. Sack. The amount was $375. On 9 February 1954, one week before her death, she purchased one bond numbered C 214 313 877 E. The amount was $75. The application was signed Goldie Goodrich. Her maiden name was Goldie Goodrich. She acknowledged receipt of the bond by signing Goldie Sack on the same day. On 16 February 1954, the day of her death, the record shows a purchase of one bond numbered C 214131776E. The amount was $75. The application was signed Goldie Sack and the acknowledgment of the receipt of the bond was signed Goldie Goodrich on the same day. It may reasonably be inferred, in the light of other evidence, that the signatures made one week before her death and on the day of her death, indicated a contemplated change of her marital relationship with the defendant.

Five bonds totaling $1,400 made out to defendant and wife were cashed by the defendant on 20 February 1954, four days after Goldie's death. The total amount of bonds cashed by the defendant on 20 February 1954 was $10,476.60. Finally the record shows that on March 2, 1953, Goldie Sack sued her husband for separate maintenance. The prayer of her complaint was as follows:

> "Wherefore plaintiff prays for decree of this Court, granting the plaintiff permanent separation from board and bed, awarding the plaintiff the sum of $350 monthly separate maintenance and decreeing the plaintiff the owner of such undivided

interest in the real and personal property of the defendant as may be just and proper.''

The foregoing evidence and the inferences which the jury might draw therefrom tended strongly to show motive for murder. The harmony of the home appears to have been impaired by quarrels which were not confined to the privacy of the home. Physical violence by the defendant against his wife is evident. There was a threatened break-up of the family relation by resort to the courts, coupled with a serious possibility that defendant might be subjected to heavy expense and loss of property. There was also apparent a hurried anxiety on the part of the defendant to reduce tangible securities to cash four days after the death of his wife and two days after the finding of her body.

We will next consider whether in connection with the evidence of motive there was sufficient evidence of the commission of the crime by the defendant to warrant its submission to the jury. We have carefully examined the transcript of testimony of 981 pages, plus 66 exhibits.

Defendant and Goldie had breakfast at about 9 a.m. on 16 February 1954 at their apartment in the Gordon Court apartments at 1626 S.W. Montgomery street. At about 11 a.m. defendant went to the Safeway store at 10th and Jefferson. They had lunch at about 1:45 p.m. Thereafter Goldie dressed and left the apartment at about 2:15 p.m. She said she was going to walk down town. Goldie was going to buy a bond at the United States National Bank, and did so. She also said she was going shopping for a ''formal''. At the bank she bought a $100 bond for $75. The transaction was handled by Mrs. Hazel F. Johnson, the Savings Bond teller at the bank whose

duties were the selling and cashing of bonds. The application is signed before delivery of the bond and is signed on the back by the purchaser on receipt thereof. The bond purchased on 16 February 1954 is the one on the back of the application for which Goldie signed "Goldie Goodrich". Mrs. Johnson observed how Goldie was dressed that day. Goldie was wearing a yellowish hat with flowers across the top. The witness examined a hat and said it looked like the hat that Goldie was wearing at that time. Exhibit 37 is a fur piece. Witness Johnson said it looked like the fur piece Goldie was wearing at that time. Goldie was at that time carrying a yellow coat and wearing a light brownish suit. The witness examined a yellow coat. We quote:

"Q I'll hand you State's Exhibit 19 and ask you if it looks like the coat she was wearing?
"A Yes, it was."

Exhibit 19 was the coat found with the body of Goldie Sack. Exhibits 17 and 18 are the skirt and jacket found on the body of Goldie. Witness Johnson was asked if they looked like the suit Goldie was wearing at the bank that day. She answered, "Yes, it is the same material." No witness testified to having seen Goldie Sack alive after 16 February 1954.

The defendant testified that after Goldie left the apartment on the 16th to go to the bank "She did not return."

"Q You never saw her alive – – – –
* * * * *
"A No, I didn't * * *."

However, it is significant that when the body was found the hat and fur neckpiece were not discovered at the scene. After her decease the executor of the

estate, George R. Goodrich, called for her clothing and personal belongings and defendant Sack delivered to him, among other articles, the hat and fur piece which were identified as those worn by Goldie at the bank. The fur piece was received without objection. The fur piece is distinctive. From these facts the jury could have inferred that Goldie did return to the apartment on the 16th and that defendant's testimony to the contrary was false. The defendant identified the coat (Exhibit 19) and the two-piece suit as Goldie's. He denied that the hat (Exhibit 36) was the one she had been wearing on the 16th, and he denied that Goldie had worn the fur piece (Exhibit 37) on that day. In this he is directly contradicted by the witness Johnson. Exhibit 36, the hat, is definitely identified as belonging to Goldie. Both the hat and fur piece were delivered to the administrator of Goldie's estate by the defendant.

Defendant Sack owned a 1950 Chrysler automobile. He testified that after returning from his morning trip to the Safeway store he did not drive the car again, either on the day or night of 16 February. Goldie did not drive a car. Defendant testified further that on the evening and on the day of the 16th the car was in front of the building which is at 1626 S. W. Montgomery. He testified that it was about 9:30 p.m. when he started worrying about Goldie's absence.

Vera Craig had previously been the manager of the apartment house under the defendant. On 16 February 1954 she went to the apartment house to have dinner with one of the tenants, Mrs. Stock. When she went in she saw defendant's automobile parked in front of the door of the furnace room. A photograph shows the apartment house. The furnace room door opens onto Montgomery street at the corner of

the building, at which corner steps ascend to the upper levels. A number of garbage cans stood by the steps. Mrs. Craig testified:

"A * * * Mr. Sack was always very kind and left his car below or above, for the tenants to have the entrance, and this is the first time I ever noticed his car right outside the apartment house."

After dinner Mrs. Craig and Mrs. Stock went to the Madelene Church in Irvington. They left there after 8 p.m., stopped on the way, and got back to the apartment house between 9 and 9:15 p.m. Defendant's car was no longer in front of the furnace room where it had been. The manager's apartment occupied by the defendant was over the furnace room.

On Thursday evening, February 18, Officer Jack Wills, accompanied by Officer Warren Weiss, interviewed the defendant at his apartment. He admitted ownership of a Chrysler automobile, and that it was down in front of the apartment. The license number was 827-107. The officers had identified car and number before the interview. It was in front of the apartment house. Defendant exhibited to the two officers the keys to the car. Asked if he had a second set, he answered that he had, and showed the second set to the officers. He stated that he was the only one who drove the car. His wife did not drive a car. On this Thursday the 18th he said his car hadn't been moved since Tuesday (the 16th) until Thursday morning. This conforms to his testimony as a witness, to the effect that he did not drive the car on the day or night of the 16th after the morning trip to Safeway. However, there was convincing evidence that he did drive the car on the evening of 16 February.

At about 5 or 5:30 p.m. on 16 February witness Miller saw defendant "where the garbage cans are"

as she entered the apartment house. This was at the corner of the building where the furnace room is located and in front of the door to the furnace room where Mrs. Craig saw the defendant's car parked as she entered the building to have dinner with Mrs. Stock. They had dinner between 6:30 and 7:15.

Witness Lola Miller saw defendant in front of the building at 6:30.

Between 9 and 10 p.m. on 16 February, George Cary left his home at 16415 S. E. Stark to get stove oil at a Richfield service station located on the southwest corner of 162nd and Stark. He carried a two-gallon can. He lived in an auto court a block-and-a-half or two blocks east of Jack and Jill's Tavern which is on the north side of Stark street. He crossed to the south side and proceeded westerly on foot past Jack and Jill's and toward the corner of 162nd and Stark. As he proceeded west he saw a car parked on Stark street with its parking lights on. The car was on the north side of the street just west of Jack and Jill's parking area, and was facing west. The car was parked off the concrete. Exhibits 5 and 6 are large photographs showing the location. Immediately west of Jack and Jill's parking area there is a vacant area wherein, close to the north edge of the highway, there is a clump of brush and Scotch broom and three trees. The car was parked just south of the brush, off the edge of the traveled road. The area is within Multnomah County, Oregon. When about two blocks away, Cary first observed the car. As he walked west he saw a man raising the trunk lid of the car. As Cary continued walking, a car came down 165th street and turned west on Stark. As that car passed Cary, the man closed the trunk lid and got back into the parked car. After the west-bound car passed, the

man got out of the parked car and again raised the lid of the trunk. Cary continued walking slowly, "watching". At that time two more cars approached from the east. The man again closed the lid and got into the parked car. Witness Cary stopped a few minutes, then continued walking. The man got out of the parked car and again opened the trunk and took something out. Cary did not see what it was, "But you could tell it was something rather heavy the way the man acted when he took it out." Cary testified further, as follows:

"Q Just show the jury how he did it. Just get down here and show the jury how he did it.

"A Just stooped in the trunk and whatever there was in there he took it out with both of his arms (indicating).

"Q And then what did he do?

"A Well, then he turned and went around the — around the back of the car to the right and —

"Q And then what, Mr. Cary?

"A Well, then he disappeared in the dark, I didn't see him no more.

\* \* \* \* \*

"A Well, it looked to me like he walked with a limp or a kind of a catch in his walk."

There is evidence that the defendant Sack was walking with a limp when seen two days later on 18 February 1954.

As witness Cary walked on past the parked car toward the service station he took the license number of the parked car. The license plate was lighted by the parking lights. Cary kept "saying it [the numbers] over" until he reached the service station on the corner. He then told the station operator to write down the number, which was then done in Cary's

presence. The slip of paper on which the number was written is Exhibit 10 and is completely identified. The license number was 827-107, which is the number of the car owned by defendant Sack. The parked car remained for 15 or 20 minutes and then the man drove by the service station. We quote:

"Q Now, Mr. Cary, did you watch that car while you were in the service station?
"A Yes.

"Q Did you watch it all the time it was parked there?
"A Yes.

"Q Did you see it when it went past the service station?
"A Yes, I did.

"Q And was there any light there at the service station?
"A Nothing only just the station lights.

"Q Was the intersection lit up at all?
"A Just the stops, just that traffic light, is all. And then a neon light on the tavern and —

"Q The traffic light was lit, was it?
"A Yes, it was.

"Q And the service station light was lit?
"A Yes.

"Q Well, when the car went by, did you look at it?
"A Yes, I did."

Cary identified the car as a Chrysler with a rear-view mirror on the left door and a red "bug catcher" on it. Loren Meyers, the service station man, and a , witness, also saw it. Cary and Meyers identified the car when they saw it in the street near defendant's apartment house.

Marion Allen lives almost exactly opposite the spot where the defendant's car was parked on Stark

street. She heard the engine of a car, which continued running for several minutes, shortly after 9 p.m. on 16 February. She looked out the window and saw the car with the trunk lid up and a man bending over the trunk. She saw, and identified, Cary, with an oil can in his hand, but she did not continue to watch. When the car drove away the motor was racing. She identified the car on the 18th near the defendant's apartment house. There was other corroborating evidence of these events.

Witness Loughrey resided at 164th and Stark streets, which is east of the spot where defendant's car was parked. On 18 February the witness saw a body lying "in back of the Scotch broom" at the point where Cary saw the man who was carrying something and who disappeared in the dark.

On 18 February at about 5 p.m. Loughrey went from his home, which is the first place east of Jack and Jill's, to the grocery store at the corner of 162nd and Stark streets. He returned, walking east on the north side of Stark street, and saw something yellow behind the Scotch broom. He walked over to see what it was and found the body of a woman. He identified a photograph which showed the body at the place found, covered with a yellow coat. Loughrey told Cullington, the grocer, who also came and saw the body. The sheriff was notified. No one touched the body until the officers arrived. The body was that of Goldie Sack. After the body was found Cary reported to the officers concerning his observations of the 16th. Thus the officers got the license number of the car from Meyers who had written it down on Exhibit 10, on information furnished by Cary on the 16th.

There is much evidence from which the jury could

properly find that Goldie Sack returned to the apartment house of the defendant after going to the bank on the 16th; that either alive or dead her body was placed in the trunk of the car and removed therefrom by the defendant Sack who was positively identified by Cary as the man who removed the object from the trunk of the car.

In the early evening of the 16th the defendant was seen by several persons near the place where his car was parked in front of the engine room of the apartment house. Witnesses testified that he acted in an unusual manner when they met him there. On the night of the 16th, and the early morning of the 17th, defendant made several calls to the hospital and to the police concerning the alleged disappearance of his wife. He also called Minnie McFarland at about one o'clock a.m. Defendant also called Goldie's sister at about eight o'clock a.m. on the 17th. The defendant apparently interrupted his inquiries concerning the whereabouts of his wife to have his car washed. An employee of the "Three-Minute Car Wash" located at 12th and Sandy Boulevard, testified that the defendant Sack brought his car in to be washed and that it was done between 8:30 and 9 a.m. on the 17th. His was the "first car in" in the morning. The defendant admitted that the car was washed but claimed that it was done on the morning of the 18th. He testified that the trunk compartment was not washed. The officers made a thorough examination of the car. They found dry sand on the rubber mat in the trunk compartment but discovered that the floor of the trunk was wet under the mat. The officers interviewed the defendant on the 18th and were told by him that the car was parked exactly where it had been parked on Tuesday the 16th when he returned from

the Safeway store, and that the car had not been moved until the 18th. We quote the testimony of officer Weiss:

"Q * * * Now, Mr. Weiss, what, if anything, did Sack say about whether he was the driver of the car on the 16th of February, that night?

"A He said it would be impossible because he had both sets of keys and that car could not have been away from the curbstone since he parked it there at eleven o'clock on the 16th, 11:00 a.m. on the 16th, because it was impossible for that car to be any place else as long as he had the keys."

On 23 February the defendant brought a suit to the dry cleaning establishment of witness Hillison. The trousers of the suit were mud-splashed. He in structed the witness that "the name on it was Smith." The witness knew Sack as a customer. Sack had never before used a name other than his own. He gave no explanation. On the next day a Mr. Jones came to the shop, handed the invoice to Hillison and received the goods. The records show that Mr. Arthur Jones was one of defendant's attorneys. It is perhaps unusual that a person should send his attorney to pick up his laundry.

The body of Goldie Sack was taken to the morgue where the defendant identified the body as that of his wife. At that time he was shown only her head, whereupon he said: "That is my wife Goldie. Where did you find her? * * * Where's her rings, where's her watch, where's her purse? Why don't you find them?" This was the defendant's first manifestation of emotion.

In the 980 pages of the transcript there is much evidence tending to support and confirm that which we have briefly summarized. Neither time nor space

will permit a review of it all. At this point we may consider certain inferences and conclusions which a jury could properly make from the evidence thus far summarized: (1) It is highly improbable that any stranger, if he had killed a woman, would seek out her own husband's car and employ it for transporting the body. (2) If a husband had a wife who was ill, unconscious, or dead, either from natural causes or by reason of the violence of some third party, he would not place his wife's body in the trunk of his car and then dump it in the underbrush in a distant place in the city. (3) The jury could properly find that the defendant Sack is the man who placed Goldie Sack's body in his own car, drove it to the place described in the evidence, and deposited it in the underbrush. The jury were entitled to find that Goldie Sack met her death as the result of violence and that the defendant was criminally responsible therefor.

■■ We next consider the evidence concerning the means by which the death of Goldie Sack was caused. Although an indictment for murder "by means unknown to the grand jury" has been held good, we have also held that an indictment for murder should allege the manner by which the deceased was killed, where that fact is shown by the evidence before the grand jury. *State v. Farnam,* 82 Or 211, 161 P 417; *State v. Weston,* 102 Or 102, 210 P. 1083. And we have intimated, though without preciseness, that when the means employed to cause death are specified in the indictment "the evidence must, as a matter of law, be considered in the light of such restricted pleading." *State v. Wilson,* 172 Or 373, 380, 142 P2d 680; and see, 26 Am Jur 337, Homicide, § 263.

" * * * The question in each case is whether the nature and character of the injury and the

manner and means of inflicting it as proved are practically and substantially, although not identically, the same as that alleged. * * * ʼʼ 26 Am Jur 348, Homicide, § 280.

Concerning variance, the same authority has the following comment:

" * * * Considerations of expedition and justice have steadily tended away from technicalities in this respect, and in many jurisdictions, either by statute or judicial declarations, the rule has been established that the indictment need not allege the means used to cause the death, and in such cases, the instrument or agency employed need not be set out. Statutes declaratory of this rule have been held not to be in violation of the constitutional right of the accused to know the nature and the cause of the accusations against him." 26 Am Jur 349, Homicide, § 280.

Experienced medical experts and criminologists testified at great length in behalf of the state. We can, of necessity, give only a brief outline of their more important findings and conclusions.

On the 18th of February, two days after the disappearance of Goldie Sack, an autopsy was performed on her body. Mildew was found upon the jacket which was worn by her when her body was found in the underbrush. The inference was drawn that the body had been exposed to the weather for about two days. Colored photographs of the body were taken and were introduced in evidence. The films were thrown upon a screen to assist the doctor in explaining his findings to the jury. The photographs thus exhibited disclosed bruises on the body of Goldie Sack. Based on the photographs, a life-sized drawing of her back was introduced in evidence without objection. The photographs and the drawings disclosed a reddish

symmetrical arc on Goldie's back, caused by a bruise. A red mark formed a half-circle slightly below her neck. The spare tire which was found in the tire well of defendant's car was photographed and a life-size transparent film of the tire was prepared and introduced. This transparent film presented a full-sized view of the hub section of the wheel. The transparency was superimposed on the full-sized drawing of Goldie Sack's back. Examination of two exhibits in this manner showed that the curvature of the hub of the spare tire was consistent with the curvature of the reddish bruise mark on Goldie Sack's back. The experiment provided persuasive evidence that the bruises on her back were caused by the tire against which her body had been forcefully jammed.

Certain tissues and specimens of the liver, kidneys, brain and stomach from the body of Goldie Sack were examined by experts. From the stomach contents an aqueous solution was made and evaporated down to 4 cc's, and some of the material was injected into a white rat which became "dopey" within five minutes, indicating that there was toxic material in the stomach. A complicated procedure with a spectrophotometer was employed and was explained to the jury. By this process it was ascertained that there were barbiturates or some substance similar to barbiturates in the material taken from the liver. The substance found was a "hypnotic depressant type of drug." There was "more than a therapeutic dose present when the drug was administered", according to the testimony. There was not, however, sufficient of the drug to cause death. These drugs can, however, cause a deep sleep.

A blood-alcohol test was made on the 18th of February and the report was placed in evidence. It showed that Goldie Sack had consumed some alcoholic bever-

age which, if taken with the hypnotic depressant type of drug, would tend to disguise the taste of the drug. The evidence of the corps of experts was such as to authorize a finding by the jury that Goldie, by reason of the administration of the drug, was unconscious when placed in the trunk of the car, and that death ensued by asphyxiation. The shutting off of the supply of oxygen was explained by the manner in which her head had been forced forward and down on her chest when in the trunk. There was other evidence that the defendant had at an earlier time procured tuinal on a doctor's prescription which had once been refilled, but which the defendant said he thought was merely a prescription for iron tablets. This bit of evidence indicates only that he knew of, and had formerly possessed, a drug similar to that which was found in the stomach and liver of the victim.

■ A long and exhaustive examination of the testimony, both lay and expert, compels the conclusion that the trial court did not err in denying the motion for a directed verdict.

By Assignments of Error 1 and 2 the defendant complains of the refusal of the trial court to grant a continuance, due to the fact that articles prejudicial to the reputation of the defendant had appeared in the Portland newspapers. Newspaper publicity appeared intermittently from 20 February until 12 September 1954, the later publications being largely a repetition of news items published shortly after the arrest of the defendant. The published reports indicated that the defendant had been involved in three previous homicide investigations. His first wife died in a fire in 1923. His second wife died by a bullet in the brain. Sack was put on trial. He was defended by Clarence Darrow. The jury found him insane and

he was committed to the asylum for the criminally insane. In both cases he profited by insurance taken out on the life of the deceased. Other newspaper reports narrated some of the evidence relative to the pending case involving his third wife, Goldie Sack.

The defendant was arrested in February, 1954. He was indicted on 2 April. Five days later he was arraigned. The cause was then continued until 20 April, on which day, accompanied by his attorney, he entered a plea of not guilty. The cause was then continued for trial at the May term. Thereafter, pursuant to the request of the defendant, the trial was postponed to 21 June. On 15 June the defendant moved for continuance to the September 1954 term and the trial was commenced on 13 September, nearly seven months after the arrest of the defendant. A motion for change of venue was made upon grounds similar to those presented in support of the motions for continuance. The motion for change of venue was withdrawn by the defendant. In this connection, we quote from *State v. Hawkins,* 18 Or 476, 478, as follows:

> " * * * If the newspaper articles had been so serious and inflammatory a character as to actually cause so deep a prejudice in the public mind as to preclude a fair and impartial trial in the county, the proper motion was not for a postponement, but for a change of the place of trial."

When the case was called for trial, counsel for defendant Sack stated, "Defendant is ready, * * *."

■ Neither the bill of exceptions nor the transcript of testimony includes all of the examination of the jurors on their voir dire. The portion thereof set forth in the bill of exceptions may be summarized as follows: Twenty-six jurors testified that they had an opinion which it would require testimony to re-

move, or they indicated for some other reason that they could not accord defendant a fair trial. In every instance the jurors so testifying were excused by the court. Counsel made the unusual contention that his client was prejudiced by the fact that he was denied the right to have some of the excused jurors on the trial jury, implying that they would have been good jurors if they had not been prejudiced by the publicity. The record discloses that the examination of jurors on their voir dire occupied four days. We do not know how many were examined, and there is no indication that the defendant exhausted his preemptory challenges or that any challenge for cause was denied. We must assume that qualified and impartial jurors were on the jury. There is nothing to show the contrary. Defendant was entitled to a fair jury. He was not entitled to have any particular jurors selected.

■ If it be assumed that the defendant was entitled to a postponement to permit a cooling-off period on the part of the public mind, it must also be recognized that it was the duty of the state to bring the case to trial with reasonable expedition. We hold that the trial court in the exercise of its discretion arrived at a reasonable conclusion for the protection of both state and defendant. *State v. Leland,* 190 Or 598, 227 P2d 785; *State v. Payne,* 195 Or 624, 244 P2d 1025. Assignments of Error numbered 1 and 2 are without merit.

■ Assignments of Error 5, 6, 8, 10, 10-A, and 13 are without merit. In each of the assignments objection was made to the admission of testimony which was for the purpose of showing motive. Evidence as to the financial condition of the defendant, his ownership of real property, bonds, and bank accounts, and evidence concerning the property standing in the

name of Goldie Sack, as well as evidence tending to show that the defendant would profit financially from the death of his wife, was relevant on this issue. *State v. Walters,* 105 Or 662, 209 P 349. The importance of the evidence concerning the financial condition of the parties becomes manifest when we consider the evidence showing that Goldie Sack had brought suit against the defendant, seeking an allowance for separate maintenance and an award of an undivided interest in the real and personal property of the defendant.

■ Assignment of Error 9 challenges the admissibility of the testimony to the effect that a suit for separate maintenance was served upon the defendant in March of 1953. Defendant also challenges the admissibility of evidence concerning the contents of the prayer for relief in the separate maintenance suit. The evidence concerning the suit for separate maintenance was clearly admissible on the issue of motive.

■ Assignments of Error 11 and 12 challenge the ruling of the court which permitted evidence of quarrels between the defendant and his wife, which evidence was clearly admissible.

■ The seventh assignment of error complains of the admission in evidence of Exhibit 36, a hat belonging to Goldie Sack. The hat in question was in the possession of the defendant on or about the 18th of February, 1954. If Goldie Sack wore the hat on the 16th, then the defendant's possession of it on the 18th would indicate that she returned home after her trip to the bank. Hazel Johnson, the savings bond teller at the bank testified that Goldie Sack bought a bond on 16 February, and that Goldie was wearing a yellowish hat with flowers across the top. The witness was shown Exhibit 36 and testified that "it looks like the

hat she had on at that time." When the hat was offered in evidence objection was made that the hat was not yellow, but whatever its shade, the witness examined it and said it was like the hat that Goldie wore on the 16th. To our inexpert eye, the hat appears to be a yellowish pink rather than yellow. The flowers across the top of the hat are yellowish. No question was raised as to the fact that Exhibit 36 was Goldie's hat and was delivered as such to her personal representative by the defendant. The defendant simply denied that Goldie had that particular hat on when she was at the bank. A fur neckpiece was also identified by the defendant as belonging to Goldie Sack. It was one of the articles of clothing delivered by the defendant to the personal representative of Goldie's estate. It also was identified by the witness Johnson as being the one which was worn by Goldie Sack at the bank. The neckpiece was received without objection. We find no error in the order of the court receiving the hat in evidence.

Assignments of Error 14 and 16 relate to the admissibility in evidence of Exhibit 62 which was a photograph of a man curled up in the trunk of the defendant's Chrysler car. The photograph illustrated an experiment performed "for the purpose of determining if a small person could be housed in that trunk." The man's weight was 130 pounds, approximately that of Goldie Sack. It will be recalled that there was a semi-circular pinkish bruise on Goldie's back which was conformable to a portion of the spare tire, as previously mentioned herein. The prosecutor stated that the experiment was performed to demonstrate to the jury the position which a body would have to be in for the spare tire to cause the bruise on Goldie's back. The defendant objected to the photo-

graph on the grounds that it was incompetent, irrelevant, immaterial, ''and that there are no facts in this case showing that the body of Goldie Sack was in that position in the car, and there is no evidence showing, by anyone, that she was there as against that.'' Defendant objected not only to the receipt of the photograph in evidence, but he also asserts that the court erred in permitting the exhibit to remain with the jury. We think there was ample evidence that the body of Goldie Sack was placed in the trunk and that the bruise was caused by the pressure of the spare tire upon her back.

The spare wheel and tire were received in evidence without objection as Exhibit 63. We have already mentioned the receipt, also without objection, of the transparent film which was a full-sized view of the hub section of the spare tire, and the full-sized drawing of Goldie Sack's back, being Exhibits 64 and 60 respectively. A photograph of the rear end of the defendant's car with the trunk open and the spare tire in place was also received without objection, and in addition to all this, the jury were permitted to view the car itself.

The medical expert, Dr. Cochran, testified as follows:

"Q (By Mr. Raymond) State's Exhibit 64 which is a negative of the photograph of the wheel known as State's Exhibit 63, and tell the jury whether or not in your opinion those bruises conform to the round part of the hub of that wheel?

"A Well, certainly any circular instrument with this diameter and this size could produce this bruise, and this has the same configuration, same angle as the bruise – – why, this instrument could and most probably – – – –

"Q Well, Doctor, is that the same configuration?

"A Yes, it is. You can see the red through here and you can — — these arcs, both these arcs, the arc of the bruise, the arc of this portion of the wheel have the same angle.

"Q You may resume the stand.

"(Whereupon, the witness resumed the stand.)

"Q (By Mr. Raymond) Doctor, do you have an opinion, from your examination now, as to the manner in which that bruise was probably inflicted?

"A Yes, I do.

"Q What is that opinion?

"A That opinion is that that bruise was most probably inflicted by the inner boss of this tire with the — — — —

"Q Doctor, what position would the body of Goldie Sack have been required to be in?

"A In order to produce that, the body would have to be on its side. * * *"

Dr. Cochran testified further, as follows:

"A * * * the position of the body within the trunk, the position which would have been produced, would have produced this wound, could certainly have produced death.

"Q By asphyxia?

"A By asphyxia."

Dr. Cochran testified concerning Exhibit 62 as follows:

"Q * * * Does that substantially reveal the position that you have described to the jury from your testimony?

* * * * *

"A It does with some qualifications."

Dr. Cochran then explained that in order for Goldie to develop the bruise on her back, the head would have to be down further than the head in the photo-

graph of the experiment. The body in Exhibit 62 was in the correct position except for the position of the head. It was explained to the jury that the photograph (Exhibit 62) was used by the experts as an aid in explaining their testimony to the jury, and that a conscious man could not hold the position with his head forced down on his chest, as could have occurred with the unconscious body of Goldie Sack. The bruise indicated that "considerable force" must have been employed in jamming her body against the spare wheel.

■ Basic to a consideration of the admissibility of the photograph, Exhibit 62, is the rule that there is a wide discretion vested in the trial court in cases depending on circumstantial evidence. 2 Wigmore on Evidence, § 444. The same author emphasizes the evidentiary value of experiments under controlled conditions. 2 Wigmore on Evidence, § 445.

■ The authorities also point out that the admissibility of evidence of experiments is a matter peculiarly within the discretion of the trial court. In *Cooper v. State,* 61 Okl Cr 318, 67 P2d 981, the court quoted with approval from a previous Oklahoma case as follows:

> " 'The general rule as to the admissibility of the result of experiments is, if the evidence would tend to enlighten the jury and to enable them to more intelligently consider the issues presented and arrive at the truth, it is admissible. The experiment should be under circumstances similar to those prevailing at the time of the occurrence involved in the controversy. They need not be identical, but a reasonable or substantial similarity is sufficient. Several courts have held that the lack of identity of circumstances affects only the weight and not the competency of the evidence provided there is a degree of similarity which will assist the jury. 22 C.J. p. 755, §§ 842, 843, 850, and 852, notes;

Clark v. State, 38 Tex.Cr.R. 30, 40 S.W. 992; Spires v. State, 50 Fla. 121, 39 So. 181, 7 Ann.Cas. 214.

" 'The experiments here were not made under identical conditions, but were under such reasonably similar conditions as would tend to throw light on the point in controversy and to assist the jury to arrive at the truth. Evidence of experiments are not conclusive; they are circumstances to be considered, weighed, and determined by the jury along with the other evidence in the case. The court did not err in admitting this evidence.' " *Sheperd v. State,* 51 Okl Cr 209, 300 P 421.

The admissibility of experiments has been upheld in *Hinkel v. Oregon Chair Co.,* 80 Or 404, 156 P 438, 157 P 789; *Kohlhagen v. Cardwell,* 93 Or 610, 184 P 261; *Horn v. Elgin Warehouse Co.,* 96 Or 403, 190 P 151; *State v. Holbrook,* 98 Or 43, 188 P 947, 192 P 640; *State v. Clark,* 99 Or 629, 196 P 360; *Adskim v. O.-W. R. & N. Co.,* 134 Or 574, 294 P 605; *Erickson's Dairy v. N. W. Baker Ice Co.,* 165 Or 553, 109 P2d 53; *Tuite v. Union Pacific Stages et al.,* 204 Or 565, 284 P2d 333. See also, ORS 41.660.

 The jury could not possibly have been misled by the reception in evidence of a photograph of a man in the car trunk. Without any reference to the picture the jury could have found that Goldie Sack's body was in the trunk on 16 February and that the bruises were caused as testified to by the expert. Circumstantial evidence is not limited to proof in the first instance of certainty. Evidence is relevant and admissible if it shows possibility, capacity, probability, or certainty. The fact that proof beyond reasonable doubt is the ultimate requirement does not militate against the value of individual items of evidence which rise no higher than proof of the possibility or probability. In this case a juror might have been un-

certain as to whether there was room in the trunk for a human body of the size of Goldie Sack. The experiment demonstrated the capacity of the trunk and the possibility of placing within it such a body. Again, despite the bruise marks on Goldie's back and the proven conformity of those marks to the curve of a portion of the spare tire, a juror might have had difficulty in understanding how a body could be placed so as to force her upper back against the tire. The photograph served to illustrate how this could happen if the body of a person were placed in the approximate position shown and if the head had been forced down in such manner as to cause asphyxia. Proof of the manner of death was not dependent on the evidence of the experiment or on any other single bit of evidence. It was the result of the totality of evidence produced. As said by Wigmore:

> "In the precedents upon the present subject, then, there is *no difference in logic or in legal principle* between evidencing a capacity, a tendency, or a certainty of operation or causation. * * *" 2 Wigmore on Evidence, § 446.

We must assume that the jurors were persons of at least ordinary intelligence and that they fully understood the limited purpose of the experiment and the picture illustrating it.

Assignments of Error 3 and 4 are captious and merit no discussion.

Assignment of Error 15 is unintelligible.

By Assignment of Error 17 the defendant complains of the interrogation of Dr. Hunter concerning the superimposition of the life-size transparent film of the spare tire (Exhibit 64) upon the picture of Goldie's back (Exhibit 60). From the examination of the two

in this manner Dr. Hunter testified that the contusion on Goldie's back could have been produced by forcible contact with the metal wheel. We have already upheld the admissibility of similar evidence given by Dr. Cochran.

The basis for the 18th Assignment of Error was the ruling which permitted the prosecution to inquire concerning a fee received by defense witness Spears for his investigation in behalf of the defendant. Spears replied that the fee was $2,000. The question was proper as going to credibility.

The 19th Assignment is based on an unintelligible objection to a question put by the state on cross examination. The answer was favorable to the defendant. No prejudice resulted.

The prosecution on cross examination asked the defendant why he walked with a limp, to which defendant replied that about two years ago he sprained his ankle. It will be recalled that there was testimony that the man who took a heavy object from the trunk of defendant's car on the night of the 16th of February walked with a kind of limp. There was also testimony that defendant limped in the sheriff's office. The court did not err in permitting the cross examination. Assignments of Error numbered 20 and 24 are without merit.

Other questions were put on cross examination as to the cost to defendant of the Gordon Court apartments. Defendant was also asked if he ever used tuinal. The answer was ''no''. No prejudicial error was committed. Assignments of Error 21 and 22 are without merit.

The basis for Assignment numbered 23 is the ruling of the court denying a motion to strike the testimony of Dr. Harris concerning Exhibit 68, a bottle

of pills containing barbital. Defendant had denied that he used sleeping pills or had ever seen the exhibit. There was testimony to which we have previously referred that the bottle was found in defendant's apartment. No error was committed.

■ Finally, the defendant contends that there is no evidence of venue. As we have shown, there was evidence tending to prove that Goldie Sack was placed in the trunk of the car in an unconscious condition at a point immediately adjacent to the furnace room door of the Gordon Court apartment house in Portland, Multnomah County, Oregon on the evening of 16 February sometime before 9 o'clock p.m., and that she was lying dead in the brush near 162nd and Stark streets, also in Multnomah County, between 9 and 10 o'clock p.m. on the same night. The jury was justified in concluding that she died of asphyxiation in the trunk of the car during the trip from the apartment house to the place where the body was found, and that she was murdered within Multnomah County.

We are well aware of the gravity of the charge against this defendant, and of the consequences of the verdict and judgment in this case. A careful examination of the extensive record convinces the court that the defendant was given a fair trial. We have found no error prejudicial to his rights. The jury was warranted, under the evidence, in finding the defendant guilty of deliberate and premeditated murder as charged in the indictment. The penalty has been fixed by unanimous verdict. The judgment pronounced thereon is affirmed.