Argued June 20, affirmed September 26, 1922.

# DERRICK *v.* PORTLAND EYE, EAR, NOSE & THROAT HOSPITAL.

(209 Pac. 344.)

**Appeal and Error—Denial of Nonsuit will not be Reversed Where There was Sufficient Evidence to Go to the Jury.**

1. A ruling of the trial court denying a nonsuit will not be reversed where the record shows sufficient evidence to take the case to the jury.

**Hospital Patient must Prove Negligence in Applying Drug Which Caused Injury.**

2. The fact that a nurse in a hospital applied the wrong drug to a patient's eye is insufficient proof upon which to base a recovery for the loss of the sight of the eye, but there must be affirmative evidence that the drug negligently administered produced the injury complained of.

**Hospitals—Evidence as to Negligence of Hospital Held Sufficient to Go to the Jury.**

3. In an action for the loss of the sight of an eye, caused when a nurse administered eserine to the eye, instead of atropine, as prescribed by the physician, evidence *held* sufficient to go to the jury.

**Jury—Re-examination of Question of Fact Forbidden.**

4. Under Constitution, Article VII, Section 3c, court may not re-examine a question of fact found by a jury unless there is no evidence to support verdict, and this regardless of any opinion the court may have as to the probative weight of the testimony.

---

2. Liability of owner or proprietor of private hospital or sanatorium for negligence of employees, see notes in 8 Ann. Cas. 1046; Ann. Cas. 1915B, 1229.

**Evidence—Statements of Patient at Time Wrong Drug was Administered to His Eye Held Admissible.**

5.   In an action for the loss of the sight of an eye, caused when a nurse in defendant hospital administered eserine to the eye instead of atropine, as prescribed by the physician, evidence by plaintiff's mother as to statements made by plaintiff after the drug was administered was admissible, though not made to a medical attendant.

**Appeal and Error—Admissibility of Evidence cannot be Considered Where No Objection was Made Until Question was Answered.**

6.   Where no objection is made to a question until after it is answered, and no motion is made to strike out the answer, the admissibility of the evidence cannot be considered.

**Trial—No Error to Refuse to Strike Out Evidence Given Without Objection When Offered.**

7.   It is not error for the trial court to refuse to strike out evidence given without objection at the time it is offered.

**Evidence—Admissions by Head Nurse of Hospital Held Admissible.**

8.   In an action against an incorporated hospital, for the loss of the sight of an eye, caused when a nurse administered eserine to the eye, instead of atropine, as prescribed by the physician, evidence by plaintiff's mother concerning a declaration of the physician in the presence of the nurse, and concerning her conduct in relation thereto, was admissible, especially where testimony on the same point was given by defendant's witnesses without objection.

**Evidence—Permitting Eye Specialist to Answer Question as to Chances of Patient Being Able to Use Artificial Lens Held not Error.**

9.   In an action for loss of the sight of an eye when a nurse put eserine in the eye, instead of atropine, as prescribed by the physician, permitting an eye specialist to answer a question as to what would have been plaintiff's chances of using an artificial lens for the eye, had he been given proper treatment was not error.

From Multnomah: WM. N. GATENS, Judge.

Department 2.

This is an action prosecuted for Raymond Derrick, by S. G. Derrick, his father, natural guardian and guardian *ad litem,* as plaintiff, against Portland Eye, Ear, Nose and Throat Hospital, a corporation, defendant, to recover $10,000 for alleged negligence resulting in the loss to the plaintiff of the sight of his right eye.   The trial of the action resulted in a judgment for plaintiff in the sum of $5,000, from which the defendant appeals.

Raymond Derrick, on the twelfth day of March, 1919, was about eleven years of age and resided with his parents at Walla Walla, Washington. On that date, while playing with a toy, the boy's eye was injured by a wire which penetrated the eyeball through the cornea, injuring the lens. The wound was located just above the horizontal meridian of the cornea. The boy was treated by Dr. Gowan, an eye, ear and nose specialist of Walla Walla, until a later date, when he was brought to Portland for further treatment.

It is averred in the complaint, among other things, that on the eighth day of April, 1919, Raymond Derrick applied to the Portland Eye, Ear, Nose and Throat Hospital, was admitted, and became a patient therein on that date and paid the hospital the sum of $49.75, "which was the usual and customary charge, for which the said defendant agreed to furnish, and commenced to furnish, the said Raymond Derrick with room, board, competent nursing and medical treatment. The said Raymond Derrick also paid the further sum of $150 for medical treatment."

It is further averred:

"That on the eighth day of April, 1919, a physician operated on the said right eye of Raymond Derrick by needling the same, and thereafter prescribed and caused a drug known as atropine to be placed in said eye, which caused the circular pupil of the said eye to be dilated, inconveniencing the patient but little.

"That on the 9th day of April, 1919, * * one of the defendant's nurses carelessly, recklessly and negligently, in violation of, and contrary to the orders of the said physician, put into the right eye of Raymond Derrick a drug which caused the pupil of the said eye and the iris to contract and to adhere to other parts of the said eye. The defendant carelessly, recklessly and negligently has forever closed and destroyed the pupil of the said right eye, and no ray * * of light

now can or ever will be able to enter or penetrate the said eye * * , and defendant carelessly, recklessly and negligently has completely destroyed the sight of the right eye of the said Raymond Derrick.''

The defendant denies the foregoing allegations, and for a further and separate answer and defense alleges, among other things, that—

''During all the times that plaintiff was a patient in said hospital said plaintiff received approved and careful treatment for his said eyesight, and the injuries complained of by the plaintiff were not the result of any carelessness or negligence on the part of this defendant.''

From the judgment recovered by plaintiff the defendant appeals to this court, assigning as error the court's rulings upon the reception of evidence, and in denying defendant's motion for nonsuit and for a directed verdict.                                AFFIRMED.

For appellant there was a brief over the name of *Messrs. Senn, Ekwall & Recken,* with an oral argument by *Mr. F. S. Senn.*

For respondent there was a brief over the names of *Mr. M. A. Stafford* and *Messrs. Richards & Richards,* with an oral argument by *Mr. Orin S. Richards.*

BROWN, J.—The defendant assigns error because of the court's refusal to grant a nonsuit. Section 182, subdivision 3, of our Code, provides that—

''A judgment of nonsuit may be given against the plaintiff as provided in this chapter * * when, upon the trial, the plaintiff fails to prove a cause sufficient to be submitted to the jury.''

The court refused to allow the motion for nonsuit, whereupon the defendant offered evidence in its own

behalf, and, at the conclusion of the testimony, moved for a directed verdict, which was denied, and the court's ruling thereon is also assigned as error.

1. It is a doctrine so familiar that we cite no decisions in support thereof, that this court will not reverse a ruling of the trial court denying a nonsuit, whenever, upon the whole case, as presented both by the plaintiff and by the defendant, the record shows sufficient evidence to take the case to the jury.

2. Before a recovery can be had in this case, the plaintiff must prove by some affirmative evidence that defendant was negligent, and, further, that the negligence of the defendant caused injury to him. The naked fact that the wrong drug was applied to the patient's eye by the nurse is insufficient proof upon which to base a recovery. In addition thereto, there must be some affirmative evidence adduced, showing that the drug negligently administered produced the injury complained of.

3. The motion for a directed verdict raises this question: Is there any evidence sustaining each necessary and material allegation of the complaint?

The record fairly shows that the defendant hospital, by its nurse, applied to the patient's eye a drug called eserine instead of the drug known as atropine as prescribed by the physician. There is expert testimony to the effect that eserine, when applied to the eye, is a harmless drug, if the eye is in proper condition. However, the experts uniformly testify that the effect of eserine is to contract the pupil of the eye; likewise, that the effect of atropine is to expand the pupil.

"Eserine: An alkaloid obtained from the Calabar bean, Physostigma venenosum, assumed by some authorities to be identical with physostygmine. It forms colorless bitter crystals, which are an active poison;

applied to the conjunctiva, it produces contraction of the pupil.'' Century Dictionary. Further, see U. S. Pharmacopoeia, 340; U. S. Dispensary, Wood, Remington & Sadtler (16 ed.), pp. 1144–1148.

Dr. E. DeWitt Connell, an admittedly skillful specialist, performed an operation upon the injured eye of the plaintiff in the treatment of a traumatic cataract resulting from injuries sustained a few weeks prior thereto by reason of the penetration of his eyeball by a wire. The operation performed by the specialist was termed ''needling'' the eye, its purpose being to absorb the cataract. Following the operation he placed atropine in plaintiff's eye and prescribed its application every few hours for the purpose of keeping the pupil of the eye expanded. He also instructed the nurses of the hospital ''how to put the atropine in.'' As a result of the application of eserine by the nurse, instead of atropine, the pupil of the eye was contracted,—a condition that the specialist was attempting to prevent.

The testimony shows that prior to the injury to his eye, Raymond Derrick enjoyed good health, and that the condition of his eyes was excellent. The boy testified that on March 12, 1919, ''I was playing with a * * wire motor and the string tangled around the wire, it sprung and flipped out and entered my eye''; that he was treated by Dr. Gowan, specialist, and Dr. Keylor, family physician, both of Walla Walla, for about two weeks; that prior to coming to Portland he could see objects in the room,—chairs, table,—and could count fingers on a person's hand for a distance of about four feet if held in front of his eyes; that he was taken to defendant's hospital, where he was cared for by a nurse; that while there the wrong medicine was, on one occasion, put in his eye; that he knew it was different medicine because it hurt his eye. He

said: "It drew my eye. About ten minutes after they put it in it commenced drawing and pulling." He testified that in the presence of his mother and the head nurse the doctor read his chart. "He [Dr. Connell] read it off. It was eserine."

The lad's evidence is strengthened by that of Dr. Connell, who testified:

"The effect of eserine is to contract the pupil. * * It would cause some pain when it began to contract. It would cause a pulling pain."

In the matter of eserine having been placed in the boy's eye, the doctor said:

"The pupil was contracted. All I know about it is the nurse said it [eserine] was used."

The boy's father testified that prior to Raymond's entry into the Portland hospital the pupil of his eye was perfectly round, looked natural; that one had to get very close to see anything wrong with it at all,— that not even the neighbors could tell which eye was injured. But "when he was brought home, you couldn't tell there was any pupil at all; it was entirely covered over."

Mrs. Derrick, the boy's mother, testified that she nursed him while he was treated at Walla Walla; that she removed the bandages, washed his eyes, and administered the medicine; that she accompanied him to the ·hospital and stayed there at night; that she slept on a cot in the room where he was; that she was present during the operation upon the boy's eye. She said:

"The first morning after the operation when he [the doctor] came in, he took the bandage off and we all looked in the eye. He said the eye looked fine, encouraging."

She further testified that on the morning succeeding the operation the pupil of his eye was dilated;

that it "looked just about like it did when we brought him to Portland, just as round and big as when we brought him from home"; that when Dr. Connell came again the following morning,

"he took the bandage off the same as the morning before, * * and he said: 'My, what is the matter with that pupil? It is pulled down like that.' He looked at the head nurse. * * She said, 'I don't know.' * * I said, 'You changed the medicine last night. She put something different in.' * * He said, 'No.' I said, 'Yes, they changed the medicine last night.' He looked at the nurse and says, 'Go and get his chart.' She went and got the chart, brought it back to the room to him as he sat there on the edge of the boy's bed. She showed it to him and I looked at it myself. He said, 'Eserine.' I said, 'Would that make any difference?' He says, 'It does just the reverse.'"

The boy's mother further testified that the head nurse admitted that the wrong medicine had been placed in his eye; also, that the nurse who "put the wrong medicine in put it on the chart she had put in eserine instead of atropine." This was the chart produced by the head nurse. Witness further stated:

"It always was, after that eserine was put in, pulled down * * and has been ever since. The iris was pulled to the middle, pulled down, and stayed pulled down."

She said that after the eserine had been put in the boy's eye, Dr. Connell ordered the more frequent application of atropine to the eye to overcome the effects of the eserine.

Dr. Gowan, eye, ear, nose and throat specialist, who treated the boy at Walla Walla, testified that the iris was not injured; that the pupil was thoroughly dilated and round when the boy got up and around after the injury; that the eye was quiet; that is to say, that there was no redness to any extent; the iris,

what little of it could be seen, was normal in color; that the boy had no pain, and that the treatment he prescribed was a solution of atropine, hot applications, a mild antiseptic dressing, and rest.

Dr. Connell testified that the medical treatment the boy had received prior to his coming to him was good, and, concerning the condition of the boy's eye when brought to him, said:

"We found the eye congested somewhat, not greatly congested. The pupil was about two-thirds dilated; a perforating wound of the cornea, which had healed, and there was a wound of the anterior capsule of the lens which gave a partial traumatic cataract."

He testified that he performed three operations of "needling" the eye for the purpose of absorbing the cataract; that he prescribed atropine in order to keep the pupil dilated. He further testified that the effect of eserine was to contract the pupil.

Dr. Hicks Fenton testified as follows:

"Q. What effect does atropine have on the eye?
"A. Dilates the pupil.
"Q. And eserine?
"A. Contracts it."

Dr. Ostrander testified that—

"The effects of eserine on a person's normal eye wouldn't last—suppose one drop of one per cent solution was used in the eye,—a normal eye, I speak of, not a diseased eye, the effect would probably be entirely disappeared in from six to eight hours. * *
"Q. What is the fact whether or not eserine is a harmless drug and used very often?
"A. Of course it all depends on what you use it for."

4. We cannot say that the court erred in denying defendant's motions, or either of them. There is

some substantial evidence supporting each material allegation of the complaint.

"In actions at law, * * the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict." Section 3c, Article VII, Oregon Const.

We are compelled to obey that command of the fundamental law, regardless of any opinion we may entertain as to the probative weight of the testimony.

5. Over the objection of the defendant, Mrs. Derrick, the mother of Raymond, was permitted to testify concerning complaints made by the child when the drug alleged to be eserine was applied to his eye. She testified that after the medicine was administered Raymond said: "Mama, the medicine hurts lots worse than the other medicine they put in." She further testified:

"He didn't sleep well that night. He kicked the covers off. I covered him up several times. He didn't rest during the night.

"Q. Where did he complain of the pain being?

"A. Well, the eye pulled. He said it felt as though it was 'pulling my eyeball out. Just draws,' he said, 'like it was pulling my eyeball out.' "

The objection does not present a new question. The testimony related to the statements of the child uttered following the administering of the medicine, and was competent, although not made to a medical attendant: *Thomas* v. *Herrall,* 18 Or. 546 (23 Pac. 497); *State* v. *Mackey,* 12 Or. 154 (6 Pac. 648); *Vuilleumier* v. *Oregon Water Power & R. Co.,* 55 Or. 129 (105 Pac. 706); *State* v. *Farnam,* 82 Or. 211, Ann. Cas. 1918A, 318 (161 Pac. 417); *Weygandt* v. *Bartle,* 88 Or. 310 (171 Pac. 587); *Northern Pac. Ry. Co.* v.

*Urlin,* 158 U. S. 271 (39 L. Ed. 977, 15 Sup. Ct. Rep. 840, see, also, Rose's U. S. Notes); *Keyes* v. *City of Cedar Falls,* 107 Iowa, 509 (78 N. W. 227).

6. Defendant assigns as error the ruling of the court in refusing to exclude the testimony of Mrs. Derrick, mother of plaintiff, relating to an admission made by the nurse. The record shows the following proceedings:

"Q. Did the nurse ever admit to you at any time thereafter that the wrong medicine was put in the eye?
"A. Yes, she did.
"Objected to as not binding on the defendant, admissions long after, no part of the *res gestae.*"

The record fails to disclose a motion to strike this answer of the witness. This court has held that when no objection is made to a question until after it is answered, and no motion is made to strike out the answer, the admissibility of such evidence cannot be considered on appeal: *Perry* v. *Hunt,* 62 Or. 256 (125 Pac. 295); *Jones Land & Live Stock Co.* v. *Seawell,* 90 Or. 236 (176 Pac. 186).

7. And it is the general rule that it is not error for a trial court to refuse to strike out evidence given without objection at the time it is offered: *State* v. *Mizis,* 48 Or. 165 (85 Pac. 611, 86 Pac. 361).

The well-established doctrine is:

"As a general rule an objection to evidence, to be available, must be made at the time the evidence is offered, and before it is admitted. * * Where a question indicates that the response to it will be incompetent or inadmissible, an objection thereto, in order to be available, must be made before the answer is given, as it is too late to object thereafter, unless the answer is given before there is an opportunity to object; a party cannot sit by and allow a question to be answered and then object in case the answer does not

suit him. · But where incompetent testimony is given in answer to a question which does not necessarily or naturally call for it, an objection thereafter made to such testimony is in time. * * But where evidence is erroneously admitted, or given without opportunity for objection, or under circumstances not calling for objection before its admission, a motion to strike it out and for an instruction to disregard it is a proper mode of raising the question of its admissibility.'' 16 C. J. 874, 875.

8. The defendant objected to the testimony of Mrs. Derrick concerning the declaration of Dr. Connell in the presence of defendant's head nurse, who was in charge of the hospital, and concerning her conduct in relation thereto. That testimony is set forth herein under the discussion of the sufficiency of the evidence. A case much in point is that of *Broz* v. *Omaha Maternity & G. Hospital Assn.,* 96 Neb. 648 (148 N. W. 575, L. R. A. 1915D, 334). In that case, Adolph F. Broz, a farmer, was a patient in the defendant hospital, paying $15 a week for his room and care. When admitted to the hospital, he was suffering from a mental disorder, which produced, at times, a delirious condition that caused him to leave his bed and otherwise to act irrationally. In a suit for damages it was averred that the hospital was negligent in permitting Broz to remain unattended and in negligently leaving in an exposed place poison tablets which the patient took, resulting in his death. Broz was attended by one Dr. Mares, his brother-in-law. He swallowed the tablets during the night. The next morning, several hours after it was discovered that the patient had taken the poison, Dr. Mares was notified and went to the hospital. He testified, over objection, to the following conversation with the head nurse on his arrival there:

"I asked the head nurse what happened, and she told me that Mr. Broz took poison, and that it was bichlorid of mercury. I asked her how could she tell it was bichlorid of mercury, and she told me she could tell by the symptoms; and I asked her, 'How did he get it?' She told me to go in his room and ask how and where he got it and what it was."

The doctor went to the room of the patient and later reported his conversation to the head nurse, who said: "That is what I thought."

The court, in its opinion, said:

"Dr. Mares called upon the head nurse, and, according to his testimony, was told that the patient had taken poison. 'How did he get it?' was then asked. This was a proper inquiry by the patient's brother-in-law. It was directed to the head nurse, an employee of defendant. She was the person who would be most likely to know the truth. The inquirer had a right to know the fact. The nurse, instead of fully answering the question, directed the inquirer to go to the patient's room and ask how and where he got the poison and what it was. Dr. Mares did as she directed, returned, and told her what the patient said. She replied, 'That is what I thought.' This is the story of Dr. Mares. Were the statements of the patient, in connection with what the head nurse said, admissions binding on defendant? The expression, 'That is what I thought,' may fairly be construed to imply previous knowledge on part of the head nurse, and to indicate the approval of the patient's version of what he took and where he obtained it. An eminent text-writer says: 'The admissions of a third person are also receivable in evidence against the party who has expressly referred another to him for information, in regard to an uncertain or disputed matter. In such cases, the party is bound by the declarations of the persons referred to, in the same manner, and to the same extent, as if they were made by himself.' 1 Greenl. Ev. (16 ed.), § 182.

"Even if no reply had been made by the head nurse to the statements tending to show negligence on the part of defendant's employees, silence might be considered an admission, under the circumstances, since the head nurse would naturally deny statements implying negligence, if untrue: 16 Cyc. 956. Defendant is a corporation and could only act through officers, agents or servants, and it is bound by what they do in the performance of their duties. Where a hospital patient takes poison at night * * while under the exclusive care of nurses, * * harsh and technical rules of evidence should not be enforced to exclude proper testimony tending to throw some light on material facts which, on account of the pecuniary interests and the reputation of the hospital, there might be a temptation to conceal. The conclusion is that there was no error in overruling objections to the admissions or declarations proved."

As bearing upon the admissions of an agent of a private corporation, within the scope of the powers of the declarant, made in connection with the performance of duty, see 22 C. J. 386, 387.

The admission made by the nurse that eserine had been applied to the eye, and the statement of Dr. Connell that its effect is just the reverse of the effect of the drug known as atropine, came into the record from defendant's witnesses without objection: *State v. Kraft*, 20 Or. 28 (23 Pac. 663); *State v. Hatcher*, 29 Or. 309, 313 (44 Pac. 584); *Stowell v. Hall*, 56 Or. 256 (108 Pac. 182).

9. The appellant assigns as error the ruling of the court involving a question submitted to Dr. Keylor, as follows:

"Q. Now, if a boy such as Raymond Derrick, having an eye in the condition in which his eye was when he came to the defendant hospital, and after having his eye further needled by Dr. Connell, had received the approved treatment at the hospital, the treatment

that would ordinarily be prescribed by a physician in a like case, what would you say were his chances of thereafter being able to use an artificial lens for that eye?"

This was objected to by defendant as incompetent, irrelevant and immaterial, proving no issue in the case, and not based upon the facts. Later, after a colloquy between the court and counsel, defendant interposed the objection "as not a proper hypothetical question."

A similar question was put to Dr. Gowan, a specialist admitted by the defendant to be qualified. He answered by stating,—

"I think his chances would have been as good as a cataract patient who had done well for two or three weeks after the operation, and that is a percentage of more than ninety-five, probably ninety-eight or ninety-nine."

We can see no reason for reversing this case on account of the court's permitting the witness to answer the question.

"A witness who is shown to the satisfaction of the court to be a competent physician * * may state facts known to qualified members of his profession as to the effect, extent and tendency of professional knowledge regarding certain matters; * * the symptoms of the given disease or injury in body, * * the usual period for recovery, and the chance that it will occur." 22 C. J. 541, 542.

For the foregoing reasons, this case is affirmed.

                                          AFFIRMED.


Burnett, C. J., and Bean and McCourt, JJ., concur.