Argued July 7, affirmed September 8, 1965

# STATE OF OREGON *v.* HARRIS
405 P. 2d 492

*Thomas H. Tongue,* Portland, and *Martin P. Gallagher,* Ontario, argued the cause for appellant. With them on the brief was Robert L. McKee, Portland.

*John N. Hutchens,* District Attorney for Malheur County, Vale, argued the cause and filed the brief for respondent.

Before McAllister, Chief Justice, and Perry, Sloan, O'Connell, Goodwin, Denecke and Holman, Justices.

HOLMAN, J.

The defendant was charged with first degree murder, the state claiming he killed his wife by burning. The defendant appeals from a conviction of manslaughter.

One of defendant's principal contentions of error was that the evidence was insufficient to warrant submitting any degree of homicide to the jury. As the evidence of guilt was circumstantial, a rather extensive and detailed examination of the evidence is required.

The defendant was employed as a salesman at a salary of $385 per month. He resided in the city of Salem with his wife and eight of their ten children— one child being married and the other away at college. He had debts and expenses much in excess of his current ability to pay.

On November 22, 1963, defendant purchased $10,000 of insurance upon the lives of both himself and his wife. On December 13 he purchased trip accident insurance of $50,000 upon the life of his wife and $20,000 upon his own life covering the period of time from 10 p.m. December 13 to 10 p.m. December 16, 1963.

On the evening of December 13 defendant and his wife left Salem in their family car for Salt Lake City. Their ostensible purpose was to enable defendant to see the head of his church in Salt Lake City, to take presents to their relatives in Salt Lake City, and to bring back their daughter from college for Christmas. No pre-arrangement was made with the head of the church to see him nor with the daughter to transport her home.

At the Santiam Pass about 60 miles from Salem it became so foggy that defendant and his wife turned around and came back to the town of Gates where they stayed all night. The next morning they returned to Salem instead of proceeding to Salt Lake City. The reason for not resuming the trip to Salt Lake City the next morning is not clear. On the evening of the 14th they again left for Salt Lake City where they arrived late the next evening.

On the 16th defendant was unsuccessful in seeing the head of his church. Thereafter he and his wife visited with relatives and left their Christmas presents. They called their daughter at college and found that she was not yet able to return home for the holidays.

In Salt Lake City defendant purchased additional trip insurance of $20,000 on himself and $50,000 on his wife covering the period of time from 5 p.m. December 16 to 5 p.m. December 17. It was contracted with a company different from the one which issued the other policies of trip insurance. The agent who sold him the policies told him he could extend the other policies by a visit or telephone call to the first company's agent a few blocks away. However, defendant insisted on purchasing the new policies. The result was that the two sets of policies overlapped from 5 to 10 p.m. on December 16.

At about 4:30 p.m. on the 16th defendant and his wife left Salt Lake City on their return trip. Their automobile was observed with two people in it at 2:15 a.m. on December 17 traveling on the highway two miles north of Burns Junction by the driver of a state highway sanding truck. A half hour later the same driver saw their car parked in a shale pit 15 miles north of the point of first observation, but he saw only one person in the car. The same driver again saw the car traveling northerly on the highway at 5:45 a.m. (Mountain Standard Time) about a mile and one-half north of the shale pit, but again observed only one person in it.

At about 6:20 a.m. (Pacific Standard Time), or an hour and 35 minutes later and a short distance further west, an eastbound truck driver saw defendant's vehicle burning a considerable distance off the highway and down a fairly steep declivity. The driver

was flagged down by the defendant who told him that he had hit a rock and run off the highway, that his car had burned, that he had been there for a couple of hours trying to get his wife out but was unable to do so and that since she was burned to death it was too late to try to do anything further.

Defendant was turned over to a state highway crew working on the highway who in turn transported him to a locality known as Basque Station where they called for an ambulance for defendant because he was burned about the face and hands and was complaining of injury to his back. While there he inquired of a member of the state road crew as to the time and was told that it was a quarter of nine. Defendant then said that his watch had stopped at ten o'clock which must have been when the accident happened and that he and his wife had left Winnemucca at eight o'clock. While waiting for the ambulance he showed two women his broken watch and asked them what time it said. When told it said 9:37 he replied that this must have been the time of the accident and that he had left Winnemucca at eight o'clock. In response to a question by a state policeman as to the time of the accident, defendant said he left Winnemucca at 8:00 p.m. and then showed his watch which was stopped at 9:37.

It is wholly improbable that defendant drove from Salt Lake City to Winnemucca between 4:30 and 8 p.m. Further, it is highly dubious that it took defendant the time between 8 p.m. and 2:15 a.m. to drive from Winnemucca to where he was observed near Burns Junction. Obviously, the accident could not have occurred at the time stated by defendant which was a time when Mrs. Harris' death, if accidental, was covered by both policies of trip insurance.

Mrs. Harris' body was found lying on the ground adjacent to the car with her chin resting on the right front door sill. She was so badly incinerated that part of her skull, the bones of the hand and part of a forearm, breast bone and some ribs were consumed along with the flesh of the buttocks, pelvis and much of the other flesh of the body. The doctor who performed the autopsy testified that her death was caused by breathing hot air which seared her lungs and that prior to death she had received a blow on the head which had fractured her skull but which was not sufficient to cause death quickly.

About nine feet away from the car and Mrs. Harris' body a rock and surrounding dirt were found with blood and hair on them. Another sample of blood and hair was found on the ground four feet four inches (perpendicular) from the right front door. In a gravel pit about twelve miles back, in the direction from which defendant had traveled, blood and hair were found a short distance from the highway. The hair taken from these three sources was compared with hair taken from the body of Mrs. Harris and an expert testified it was highly probable that the hair came from a common source. The blood from the gravel pit and the rock was found to be Type O, as was Mrs. Harris' blood.

Dirt was taken from the place on which the body lay. It was tested and found to contain a fluid similar to a mixture of burned human fat and gasoline. One sleeve each of defendant's suit coat and shirt were found to contain lead which is an ingredient of gasoline.

The tires were burned from the car, lowering the frame almost to the ground. When the car was raised two days later for the purpose of removal, the bottom

of the gasoline tank was found to have some holes punched in it. An expert testified that he microscopically examined and compared the holes in the tank with wax impressions made by the end of a lug wrench found after the fire locked in the trunk of the car. It was his opinion that the wrench had been used to make at least two of the holes in the tank. He further testified that the holes were made prior to or during the fire since their ragged edges showed scale from the heat of burning. The tire marks of the automobile, as it left the road at a 45 to 50 degree angle, were sharp and clear and showed no skidding.

The defendant told a particularly unconvincing story. He claimed that he was thrown from the car and knocked out and that when he regained consciousness he attempted to remove his wife from the burning car. He stated that she was crumpled on the floor between the front seat and the dashboard and that he was unable to remove her because she was stuck. Defendant admitted, however, that he was able to get her legs and thighs out of the door. There was not shown to have been any deformity in this part of the car caused by the accident which would have impeded her removal.

Most of the above evidence was either contradicted, minimized or partially explained away in some respect by defendant's evidence. Nevertheless, the jury had the privilege of believing that which is recounted above and drawing all legally permissible inferences therefrom. In the case of *State v. Dennis,* 177 Or 73, 77, 159 P2d 838, 161 P2d 670 (1945), in referring to the rule that where guilt is proved by circumstantial evidence alone the proof must be inconsistent with any reasonable theory of innocence and incapable of explanation upon any rational hypothesis other than

that of guilt and the further rule that proof of guilt must be proved beyond a reasonable doubt, the court stated as follows:

"* * * This does not mean that all of the testimony must be consistent with the guilt of the defendant. The testimony may be conflicting, yet the facts proved may warrant a verdict of guilty upon circumstantial evidence alone."

■ The evidence in the present case would amply support a conviction for any degree of homicide. The evidence would tend to indicate murder rather than manslaughter. However, we cannot say there is not evidence sufficient to maintain a conviction of manslaughter as defined by ORS 163.040. Manslaughter, by this statute, is not limited to killing in the heat of passion. Subsection (3) provides:

"Every killing of a human being by the act * * * of another, when the killing is not murder in the first or second degree, or is not justifiable or excusable * * * is manslaughter."

■ It is not this court's function to weigh the evidence or the logic with which it was construed but only to decide whether there is any evidence sufficient to sustain a conviction of manslaughter. The jury had evidence from which it could believe that the defendant killed his wife without justification or excuse, and it could disbelieve or have been in doubt that he did so with deliberation, premeditation, or malice.

In the case of *State v. Butler,* 96 Or 219, 235, 186 P 55 (1920), this court said as follows:

"* * * It is urged that there was no evidence of manslaughter, and that this instruction was abstract. But every killing is manslaughter unless it is justifiable or excusable; or is accompanied by

malice or deliberation, when it becomes murder in the first or second degree.

"In this case, if the jury was in doubt as to whether there was any malice and was satisfied the killing was not justifiable or excusable, it was bound to find a verdict of manslaughter. * * *"

In *State v. Nortin,* 170 Or 296, 299, 133 P2d 252 (1943), the court said:

"* * * If there was substantial evidence of murder in any degree followed by a verdict of guilty of manslaughter the defendant cannot complain of the denial of his motion for a directed verdict. * * *"

For cases sustaining a conviction of manslaughter when the evidence, if believed, strongly indicated murder, see *State v. Sing,* 114 Or 267, 229 P 921 (1925); *State v. Ellsworth,* 30 Or 145, 47 P 199 (1896). In the *Sing* case the court said, at page 283:

"In a case of homicide, when the evidence adduces even slight proof which tends to reduce the degree of homicide from murder to manslaughter, the trial court should give the defendant the benefit of any doubt that the evidence may suggest and instruct upon manslaughter."

■ The language of ORS 163.040 (3) has remained substantially the same since the Deady Code of 1864. It was apparently taken from the statutes of Oregon (1855), page 210, § 15. In the preface (or "advertisement" as it was called) to the 1855 statutes the compiler stated that "that part of the Oregon Statutes relating to the manner of commencing and prosecuting actions at law, are taken word for word, from the New York Code." The New York law of that time had a substantially similar section, Volume 2, New York Revised Statutes, page 848, § 19 (4th ed. 1852). The purpose of this provision of New York law is

stated in the official report of the New York Code revisers as follows:

> "Intended to guard against all danger of omission of any case, and to include some that are anomalous." Volume 3, New York Revised Statutes, page 813 (2nd ed. 1836).

It is apparent that this section of our manslaughter statute must have been intended as a "catch-all" to encompass those killings which were not otherwise covered by statute and which were not justifiable or excusable. Long ago this court stated that this section "is an *omnibus* provision." HARRIS, J., *State v. Holbrook,* 98 Or 43, 98, 192 P 640 (1920).

■ Defendant next claims that the court erred in admitting evidence of the lug wrench and the holes in the bottom of the gas tank. Defendant contends that it was not shown that there had been no substantial change in these items since the occurrence in question because the burned vehicle and its contents had remained unguarded from December 17 to December 19 when it was removed by the State Police. The evidence shows the gas tank was located underneath the trunk of the car. After the fire the underside of the rear end of the car was only three or four inches from the ground. Thus, after the fire and until the car was removed there was virtually no opportunity for anyone to punch the holes. In addition, the evidence indicated that the holes were made before or during the fire. It was not error to admit evidence of them.

■ The next ground of appeal is that the court erred in refusing to admit evidence showing a framework of wood in the outline of a car built over the spot where the car burned and in refusing evidence of an experiment whereby a gallon jug of water was poured

on the ground at a place estimated to be over the point where the holes were punched in the gas tank. Both the exhibit and the experiment were offered for the purpose of showing the direction and amount of slope of the area concerned. It was not error to refuse to admit the tendered evidence for two reasons: first, there was other evidence offered by defendant and admitted by the court showing the slope of the area and second, such demonstrative evidence was within the discretion of the trial judge. *State v. Sack,* 210 Or 552, 300 P2d 427 (1956).

■ During the state's case in chief a member of the State Police assigned to arson investigation testified over objection that he had examined a hundred burned cars and that the vehicle in question was burned far more than any vehicle he had observed or upon which he had made an investigation. The defendant attempted to rebut this with testimony that another vehicle some miles distant had accidentally run off the road and had been burned to as great an extent. This was prevented by the court which ruled that what had occurred to another car under different circumstances was not relevant. This exclusion is charged as error. It is our opinion that the testimony offered by the state was of doubtful admissibility; however, upon appeal the defendant does not assign its admission as error. He assigns as error only the court's failure to allow him to show what happened in another accident occurring under different circumstances. We believe the court's exclusion of the offered testimony on the grounds of irrelevancy was correct.

The state introduced evidence that the defendant gave a rather confused and inconsistent story concerning what had occurred during and prior to the claimed accident. The defendant contended that this

confusion—particularly that relating to the time of the accident—was because he was suffering from retrograde amnesia as a result of what had occurred. The claimed amnesic period was for several hours during and preceding the claimed accident. To prove he did have amnesia he called as a witness a medical doctor who had treated him for his claimed amnesic condition. The doctor was allowed to testify that in his opinion defendant was suffering from a genuine retrograde amnesia which was brought about either by the physical or mental shock or a combination of the two which he experienced as a result of the claimed accident.

The doctor treated the defendant by hypnosis in an effort to overcome the amnesic condition and testified that he was successful by this means in restoring defendant's memory. The court, in permitting the doctor to tesitfy as to what the defendant told him prior to treatment, reasoned that this was the history the doctor used as one of the bases for his diagnosis and treatment. The court excluded, however, the statements made to the doctor by the defendant while under hypnosis as well as those he made to the doctor after his memory was restored by treatment. A tape recording was made of the defendant's statements to the doctor while under hypnosis. When it was offered in evidence it also was excluded. The court's exclusion of evidence of the defendant's statements to the doctor while under hypnosis and after defendant's memory was restored concerning how the claimed accident occurred is charged as error.

It is claimed the statements were admissible both to prove what actually occurred and as a basis for the doctor's opinion that the defendant was suffering from retrograde amnesia.

The fact that the statements under hynosis were tape recorded is irrelevant in considering admissibility. If the testimony of the doctor as to defendant's statements under hynosis is admissible, the tape recording most certainly is also admissible. The question is whether the statements were admissible at all.

■ They were not admissible to prove what occurred. They were self-serving statements made by defendant while he was not under oath and not in court. The fact that he was under hypnosis when he made them makes no difference, as such a mental condition does not guarantee truthfulness—and the doctor so testified. An exception to the rule that hearsay statements may not be used to prove the truth of the asserted facts may exist where there is both a guarantee of their truthworthiness and a necessity for them. 5 Wigmore, Evidence (3d ed) § 1420. It might be said that in the case at bar there was some guarantee of trustworthiness since the statements were made to a doctor in the hope of receiving helpful treatment. However, there was no necessity to admit them in evidence to prove the truth of the matter because the defendant was able at trial to recite, and did recite, the circumstances surrounding the claimed accident.

■■ The defendant claims, however, that the statements were admissible in any event to show the basis for the doctor's diagnosis. The doctor testified that what defendant said and his manner of saying it while under hypnosis were also a basis for his conclusion that defendant had a genuine amnesic condition. Statements made by a person to his physician who is consulted for the purpose of diagnosis and treatment and which are a basis for the physician's opinion of the patient's condition are ordinarily admissible to qualify and authenticate his opinion: *Malila v. Meacham,* 187

Or 330, 339, 211 P2d 747 (1949); *Reid v. Yellow Cab Co.,* 131 Or 27, 41, 279 P 635 (1929); *Weygandt v. Bartle,* 88 Or 310, 319, 171 P 587 (1918), but not for the purpose of proving that the facts recounted what actually occurred, *Malila v. Meacham,* supra, unless they are expressions of present pain and suffering which are admissible without respect to whether they are told to a medical or other witness: *Frangos v. Edmunds,* 179 Or 577, 593, 173 P2d 596 (1946); *Derrick v. Portland Eye, etc. Hospital,* 105 Or 90, 99, 209 P 344 (1922); *Weygandt v. Bartle,* supra, at 319. However, the nature of the statements made to a treating physician which may be related to the jury are primarily restricted to the symptoms, ills, locality, and character of the pain and perhaps to the force of a blow that was received. Statements as to the circumstances attending the injury relating to other principal issues in the case such as negligence are not admissible. *Wise v. SIAC,* 148 Or 461, 474, 35 P2d 242 (1934); *Tycer v. Hartsell,* 184 Or 310, 314, 198 P2d 263 (1948).

In the usual situation it is not necessary for the medical witness to rely, as a basis for his diagnosis, upon statements relating to other principal issues in the case. We are now met with a situation where the witness claims it was necessary to do this to establish his opinion of defendant's mental condition. The statements upon which the doctor said he relied are the defendant's version of the occurrence in question. In testimony excluded from the jury, but made to the trial judge in explanation of the tape recording, the doctor related how defendant's teeth chattered when he told how cold it was, how the tears ran down his face when he told what happened to his wife, and how he shouted and twisted and turned as he recounted his efforts to extract his wife from the burning ve-

hicle. Defendant not only cites cases holding that statements which are the basis for an expert's opinion are admissible if made to a treating doctor but also cites cases holding that his opinion is not admissible unless the basis for it is shown. *Henderson v. Union Pacific Railroad Company,* 189 Or 145, 167, 219 P2d 170 (1950), states as follows:

> "It is the rule in this state, as elsewhere, that 'an expert, though thoroughly qualified as a witness, cannot be permitted to give an opinion upon facts known to him, and not communicated to the jury'; that 'no allegation can be proved by the *ipse dixit* opinion of any expert unless the facts or phenomena upon which he bases his opinion are disclosed either by his own testimony or that of other witnesses.' * * *"

Defendant urges that proper procedure at the trial below would have been for the court to permit the jury to hear both the testimony of the doctor about, and the tape recording of, the defendant's statements as to what had occurred coupled with a cautionary instruction that it should consider the testimony only as a basis for evaluating the doctor's opinion that defendant had retrograde amnesia and that it should not consider such testimony for the purpose of deciding whether the occurrences happened in the manner recounted by the defendant.

The courts of both California and Washington have had occasion to pass on a similar question. Both have decided that, where statements relied on by a physician as a basis for a diagnosis of mental condition are such that the jury would be confused as to whether it could consider the statements as independent proof of the facts recited, the witness may give the opinion, but the statements of the patient may not be related to the jury. They held that it was a matter

of discretion with the trial judge as to whether the danger of confusion on other important collateral issues outweighed the probative value of the evidence as part of the basis for the expert's opinion. In *State v. White,* 60 Wash. 2d 551, 374 P2d 942 (1962), the situation and contention is identical with the present case except that there the defendant had been given a so-called truth serum instead of being hypnotized, and the physician did not claim to have administered treatment. There the court said, at page 953:

> "A layman would find it extremely difficult, if not impossible, to make an accurate evaluation of the testimony which was offered. On the other hand, the possibility that a jury might be confused or misled by such evidence is quite real. Therefore, the trial court could have concluded that whatever dubious value such testimony might have would be more than outweighed by the danger of its misinterpretation and misuse by the jury. It would have been quite proper for the trial court, in the exercise of its sound discretion, to exclude the proffered evidence on the basis of the foregoing reasoning.
>
> "We hold that the trial court in this case did not abuse its discretion in limiting the testimony of Dr. Sutch to explaining the use of the drugs by him and to giving his opinion as to appellant's mental condition based on his own examination of him while under their influence. Nor was there any abuse of discretion in refusing to admit the tape recording * * *."

The cases relied upon by defendant in urging the admissibility of the excluded evidence are largely from the courts of California. However, the California court recently used the following language in *People v. Modesto,* 59 Cal 2d 722, 732-733, 31 Cal Rptr 225, 382 P2d 33, 39 (1963):

> "Defendant contends that the trial court erred

* * * in excluding a tape recording of statements made by defendant while under hypnosis. Dr. Zonnis was allowed to state her opinion as to defendant's intent at the time he entered the Mack house and at the time defendant struck the girls. She testified repeatedly that she based her opinion on what defendant had told her and upon her psychiatric evaluation of him. At no time was she precluded from considering information derived from defendant while he was under hypnotic trance. Indeed, on cross-examination, Dr. Zonnis testified that she based her opinion 'On the interviews that I had with him, the consistency of his responses, and on the information that corroborated what he had previously said that I obtained in the hypnotic interviews with him.'

&ast; &ast; &ast;

"Although the tape recording of defendant's statements while under hypnosis might properly have been excluded in the exercise of the trial court's discretion to weigh its probative value as part of the basis for the expert's opinion against the risk that the jury might improperly consider it as independent proof of the facts recited therein, the record shows that the trial court did not exercise this discretion * * *."

We believe the decisions of the Washington and California courts are correct and are consistent with the practical administration of justice. An implied prerequisite to the application of the rule that an expert witness must recount the entire basis for his opinion is that the value of such information not be outweighed by the danger that the jury will be confused on other principal issues of the case.

The trial court in the present case correctly considered the danger of confusion and concluded that it

was too great to admit the statements. The court stated as follows:

"Now, number two, is it permissible for the jury to hear statements made by Harris pertaining to this incident while he was in a hypnotic trance. I can see where it probably could, under some circumstances, be permitted to go before a jury merely for the purpose of having the jury know and understand upon what the doctor based his diagnosis but, under no circumstances could such go before a jury for the purpose of proving the facts of the statement.

"Now, in this case, I can see absolutely no way a jury can accept these statements, while made in a trance, only for the purpose for which it would be received into evidence, that they would be receiving the statement as evidence of the fact asserted in the statement and I don't feel that I could permit that statement to go before the jury.

\*　　　\*　　　\*

"\* \* \* I can't have any cautionary instructions I could give the jury which would allow the jury to place the testimony of the doctor or the record in its proper light so I shall have to restrict the doctor to testifying as to what the patient told him prior to being placed in a hypnotic trance and have the doctor testify as to his opinion as to whether or not the patient was in a trance and have the doctor testify as to his opinion concerning whether or not this patient has retrograde amnesia. \* \* \*"

█ It is amply apparent that the trial judge did not abuse his discretion in not admitting the offered testimony. The defendant testified concerning the circumstances of the claimed accident and the jury thus was informed of the statements which were the basis for the doctor's opinion.

■ The defendant contends the statements made to the doctor after his memory was successfully restored should have been admitted. There could be no possible grounds for their admission. They were not used as a basis for a diagnosis and treatment as the patient was already cured.

■ As a last claim of error defendant contends the court should have excluded from the evidence the hair samples because the state's expert witness testified that they could not be positively identified as being the hair of the decedent. The witness did testify that it was probable that they were. The requirement that the guilt of the defendant be proved beyond a reasonable doubt does not prevent the admissibility of evidence that does no more than prove possibility or probability. This court, in the case of *State v. Sack,* 210 Or 552, 581, 300 P2d 427 (1956), stated as follows:

"* * * Circumstantial evidence is not limited to proof in the first instance of certainty. Evidence is relevant and admissible if it shows possibility, capacity, probability, or certainty. The fact that proof beyond reasonable doubt is the ultimate requirement does not militate against the value of individual items of evidence which rise no higher than proof of the possibility or probability. * * *"

The judgment of the trial court is affirmed.