**Donald LAWSON, Appellant,**

v.

**STATE of Iowa, Appellee.**

**No. 61820.**

Supreme Court of Iowa.

June 27, 1979.

Patrick J. Life of Life Law Office, Oskaloosa, for appellant.

Thomas J. Miller, Atty. Gen., and Ann Fitzgibbons, Asst. Atty. Gen., for appellee.

Considered by REYNOLDSON, C. J., and UHLENHOPP, McCORMICK, McGIVERIN, and LARSON, JJ.

UHLENHOPP, Justice.

This appeal from denial of postconviction relief questions the validity of a verdict where, without the knowledge of either party, a witness was hypnotized before testifying in the prior trial.

In 1972 petitioner Donald Lawson was convicted and sentenced for second-degree murder. In 1976 he commenced the present postconviction proceeding, claiming in part that a witness in the murder trial had been hypnotized. Section 663A.2 of the Code of 1975 provides that a convicted person may institute proceedings to secure relief when:

1. The conviction or sentence was in violation of the Constitution of the United States or the Constitution or laws of this state;

.   .   .   .

4. There exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice; [or]

.   .   .   .

6. The conviction or sentence is otherwise subject to collateral attack upon any ground of alleged error formerly available under any common law, statutory or other writ, motion, petition, proceeding, or remedy   .   .   .   .

Marilyn Yeager, a material witness in the homicide trial, testified in that case for the State and for Lawson. The evidence at the postconviction trial establishes beyond question that in connection with the prior trial Yeager underwent some type of hypnosis on at least three occasions: before she originally testified for the State, before she testified on rebuttal for the State, and later to obtain headache relief. We may safely say that the third time did not affect her

testimony. The record shows that neither the State nor Lawson knew, at the time of the homicide trial, about the hypnotization. The hypnotization was administered by a neighbor, Ed Augustine, ostensibly to calm Yeager's nerves so she could face the ordeal of taking the stand. Lawson learned about it later when Yeager informed him at the penitentiary where she came with a friend who desired to see another inmate. In the present postconviction proceeding Lawson claims violation of his constitutional and nonconstitutional rights in the homicide trial.

The postconviction trial court found that Lawson "failed to establish that [Yeager] was in a hypnotic condition when she testified at the trial of [Lawson]." The State's position on appeal is essentially the same: "There is no showing that [Yeager] was in a hypnotic state when she testified." This position seems to be based on the theory that if Yeager was not in a state of hypnosis when on the stand, any prior hypnosis was immaterial. We believe this theory requires further analysis.

The present case is governed by the following principles enunciated in *Snyder v. State*, 262 N.W.2d 574, 576 (Iowa 1978):

Petitioner has alleged violation of constitutional safeguards and thus we make our own independent evaluation of the whole record under which the postconviction court's ruling was made. [Citations omitted.] However, the burden of proof is on petitioner to establish the facts asserted by a preponderance of the evidence. (Citations omitted.)

We first consider the evidence and then the legal effect of the hypnosis.

I. *The evidence.* Portions of Yeager's direct testimony in the postconviction proceeding follow:

Q. Please state to the Court under what circumstances and when you were hypnotized during the process of the trial? A. I imagine the first time would have been at Mr. Augustine's home before I came to the courthouse, I imagine, and then one time when I had to go back

on the stand for the prosecution the last day, and I was upset and didn't want to go back on the stand, and he hypnotized me in Mr. Fenton's office. Mr. Fenton had gone out and he told me I would just relax and be able to go through it. One time when we left the courthouse and I was upset and had a headache, he hypnotized me in the car to relieve the headache. Those are the times I remember.

. . . .

Q. Now, do you know whether or not Mr. Augustine was also a witness for the prosecution? A. Yes, he was.

Q. And that was on rebuttal evidence; is that correct? A. Yes.

Q. And was he also a friend of Penny Clark [homicide victim], if you know? A. Yes.

. . . .

Q. Now, at the time you were hypnotized on any one of the particular three occasions, were you given any suggestions such as to relax or anything like that, if you know? A. Yes.

Q. Would you answer? A. I was told I would relax and that I would answer the questions clearly and they would come to me, but it would come to me, but it would seem more like a drama unfolding in front of me so it wouldn't bother me quite so much.

. . . .

Q. Do you recall a matter of being nervous around Lawson's presence? A. Yes.

Q. And were you advised you would not be nervous around Don's presence? A. Yes.

Q. How was that communicated to you by Mr. Augustine, if you know? A. I can't remember what he said about Don exactly except that I would be able to look at him and it wouldn't bother me, you know, so much to see him there. Something to that effect. I don't know.

Q. Now, you say the first time you were hypnotized at your home? A. No, not at my home. Ed's home.

Q. This is the morning of the first day you appeared at the trial? A. As far as I can remember; yes.

Q. And the second time you were hypnotized was where? A. I can't remember them in order really.

Q. Okay. A. But I do know once in Mr. Fenton's office.

On cross-examination, Yeager testified in part:

Q. And you knew it was a murder trial? A. Yes.

Q. And you weren't disoriented in any way or anything like that? A. No, other than being nervous.

Q. You were nervous? A. Yes.

Q. That is not uncommon for a witness in any trial to be nervous. When you testified, you were able to understand the questions the attorneys asked you without any trouble? A. Yes.

Q. You responded to those questions telling the truth? Is that right? A. Yes.

. . . .

Q. You did tell the truth each time you testified? A. Yes.

Q. The sole reason you were so-called hypnotized is merely to relax you; is that correct? A. Yes.

Q. You were nervous; is that right? A. Yes, very.

Q. And you used that for when you were learning how to drive a car? A. Yes.

Q. Did that enable you to drive the car okay? A. Yes, it helped very much.

. . . .

Q. Your testimony at the trial was not influenced in any way by that hypnotism was it? [Objection, overruled.] A. I don't believe it was.

Q. Nothing was suggested to you by way of what answer to give? A. No.

Q. Other than anything of your own personal knowledge? A. That's right.

Q. And you testified as to your own personal knowledge, is that right? A. Yes.

Yeager also testified:

Q. Do you know where Mr. Augustine was during the process of the trial, the actual trial? A. No, I don't think he attended the trial, to my knowledge, until the last day.

Q. Do you know whether he was ever in the courtroom at the time of the trial? A. I don't know, but I just cannot remember him being there except that last day when he went on the stand.

D. Eric Elster, a clinical psychologist, was a witness. He testified that hypnotism has various stages, "from a very, very light level of hypnosis to a very, very deep level called somnambulism, similar to sleepwalking." He described the stages thus:

Stage 1 is a stage in which there is minor alteration of consciousness that a person could function in or make a very, very light stage people go into very rapidly. The second stage you go in would be where you would have some rapid eye movement. The third stage you would have some—you could develop some rigidity of the limbs. The fourth stage would be even more rigidity, even more concentration, and the fifth stage would be complete somnambulism where there would be loss of memory, loss of recall.

Relevant portions of Elster's testimony follow:

Q. Please state under the first stage of hypnosis what can be done by the person who is inducing the hypnosis insofar as the manner of control of the person is concerned? A. You don't have—contrary to belief, you don't have control over the person. You can't make that person jump out of a window or commit suicide or do anything that is going to be injurious to themselves. You are simply concentrating their mind where the external stimuli are not disturbing to them, that they shut out certain things, and their focus is narrowed down.

Q. What is the manner of control in the second stage of hypnosis? A. Again,

you have no control. The person could get up and walk out if they wanted to.

Q. If they did not want to, then could they be controlled as to performing physical acts? A. They are allowing you to direct them.

Q. What is the manner of control in the third stage of hypnosis? A. The patient or subject still retains control only that they are giving you more allowance to direct them.

.  .  .  .

Q. Now, Mr. Elster, insofar as the matter of hypnosis is concerned, is there a reverse—let's go into the matter of hypnotic suggestion. What are hypnotic suggestions, pre-hypnotic suggestions, post-hypnotic suggestions, and hypnotic suggestions while in the trance? A. Pre-hypnotic suggestions are the suggestions you are giving the person prior to inducing hypnosis. When you induce hypnosis, the mind or brain becomes more susceptible to suggestions.  .  .  . The hypnotic suggestions during hypnosis, which is there I was, and that is direct suggestions to the patient, and post-hypnotic suggestions are suggestions that are given during hypnosis which will be carried out after the hypnosis session is finished. That means the person would be in the wakened state, fully normal state, and you could give them a suggestion or a certain command, a certain cue, a certain indication, that certain types of things are going to happen with them or they are going to do certain things.

Q. Can you give them commands to respond to certain questions that might be asked by an independent person? A. Yes.

.  .  .  .

Q. Could a person be given suggestions which would affect the opportunity of counsel to cross-examine or examine the witness? [Objection, overruled.] A. When a person is in hypnosis, their field of concentration can be narrowed to the point where they would not respond at times as they would at other times. They

can be concentrating on something else. They can be given indirect suggestions to deflect—or separate their concentration from what is going on.

. . . .

Q. Could it affect the person's response to a question by an examiner? [Objection, overruled.] A. A person in hypnosis—their mind is concentrated, their body is more relaxed. Not being an attorney I don't know if you watch body language or whether you watch what people do, how they act, or how they sit or how they look, whether they are upset or not. Being in hypnosis you would be more relaxed. If you were more relaxed, your body language would change, the amount of movement, detraction or anything going on. If that would affect the attorney's ability to examine or cross-examine them; yes.

Defense counsel then posed the following hypothetical question:

Q. If a witness were hypnotized previous to the time that that witness was called to the stand on or about the 20th day of March, 1972, to testify for the prosecution in a criminal case wherein the defendant was charged with the crime of murder and said witness had been directed or commanded to relax prior to the time or during the time of the testimony given by that witness and such witness was in fact hypnotized prior to the time of said testimony, and that said witness did testify upon the stand, is there a reasonable possibility that that witness's testimony, acts, or conduct, would be affected by the hypnosis?

Elster answered:

A. That is a yes or no question. My answer would be yes to that. There is a high degree of possibility it could be affected because they could have been placing themselves in self-hypnosis, they could have been highly relaxed, their body language is going to change facial reactions or anything their mind is going to be concentrated on, and it could be concentrated on such a thing as the calendar hanging over there on the wall.

At the postconviction hearing the prosecutor in the homicide case testified regarding that trial:

Q. At any time during the particular case, while it was being tried, were you aware of or did you have knowledge that any witnesses were being hypnotized by anybody in the particular case? A. I did not.

Defense counsel at the homicide trial testified at the postconviction hearing:

Q. At any time was it ever drawn to your attention during the time of the trial or before the trial one Marilyn Yeager had been hypnotized prior to the time of the trial? A. No.

II. *Effect on validity of verdict.* The State seems to approach the effect of the hypnosis from the standpoint of the *admissibility* of Yeager's testimony at the homicide trial. Its argument runs thus: Yeager was not under hypnosis at the homicide trial itself, her testimony was thus admissible, and the prior hypnosis was therefore immaterial. We assume that the evidence in this proceeding does not show Yeager was under hypnosis when she testified in the homicide trial and her testimony in that trial was thus admissible. Most of the cases in this area holding "hypnotic" evidence inadmissible involve testimony of witnesses as to pretrial statements of other persons then under hypnosis, or testimony of witnesses who are under hypnosis at trial. *E. g., State v. Harris,* 241 Or. 224, 405 P.2d 492 (1965); *Greenfield v. Commonwealth,* 214 Va. 710, 716, 204 S.E.2d 414, 419 (1974) ("We agree with the vast majority of authorities which have concluded that hypnotic evidence, whether in the form of the subject testifying in court under hypnosis or through another's revelation of what the subject said while under a hypnotic trance is not admissible."). The problem here relates to the State's conclusion that prior hypnosis is immaterial. Courts have said that a defendant may use the fact of a witness' prior hypnosis in an attempt to discredit or destroy his testimony, but these are cases of course in which the defendant

knew at trial about the prior hypnosis. Among them are *United States v. Adams,* 581 F.2d 193 (9th Cir.), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *Wyller v. Fairchild Hiller Corp.,* 503 F.2d 506 (9th Cir. 1974) (civil case); *Harding v. State,* 5 Md.App. 230, 247, 246 A.2d 302, 312 (1968), *cert. denied,* 395 U.S. 949, 89 .S.Ct. 2030, 23 L.Ed.2d 468 (1969) ("the hypnosis procedure was fully exposed in the evidence"); *State v. McQueen,* 295 N.C. 96, 244 S.E.2d 414 (1978); and *State v. Jorgensen,* 8 Or.App. 1, 492 P.2d 312 (1971). Federal courts have held that a defendant's right to try to discredit a previously hypnotized witness is of such importance that a guilty verdict cannot stand where the prosecutor violated a duty to disclose information about the hypnotization. *United States v. Miller,* 411 F.2d 825 (2d Cir. 1969); *Emmett v. Ricketts,* 397 F.Supp. 1025 (N.D. Ga.1975). We do not have such a case here.

What should be the result in the present case where we have a material witness hypnotized before testifying in chief and on rebuttal in a prior trial, a prosecutor unaware of the hypnosis, and an accused likewise uninformed of the hypnosis and thus unable to delve into the facts about it at that trial? Since the prosecution was not responsible for the accused's unawareness of the hypnosis, should a guilty verdict be permitted to stand? While Lawson argues several grounds, we believe what we actually have here is a claim by Lawson of newly discovered evidence, and that the result turns on whether that evidence—unquestionably newly discovered—requires a new trial *under the present facts.*

We stated the principles regarding newly discovered evidence in *State v. Sims,* 239 N.W.2d 550, 554–55 (Iowa 1976):

> In *State v. Farley,* 226 N.W.2d 1, 3 (Iowa 1975), we listed the elements which must be established to sustain a motion for new trial under § 787.3(8) based on newly discovered evidence. The defendant must show (1) the evidence was discovered after trial and before judgment, (2) it could not have been discovered earlier in the exercise of due diligence, (3) it

is material to the issue, not merely cumulative or impeaching, and (4) it would probably change the result if a new trial is granted. Only the part of the first element requiring discovery of the evidence "before judgment" seems inconsistent with the postconviction situation. That requirement is uniquely related to a motion for new trial since such motion must be made before judgment. § 787.2, The Code.

Because postconviction relief is available only after judgment of conviction or sentence and neither affects nor replaces any remedy incident to proceedings in the trial court, we hold the requirement that newly discovered evidence be discovered "before judgment" has no application in the postconviction situation. § 663A.2, The Code. Instead, the postconviction applicant must show the evidence was discovered after judgment. He may not rely on evidence discovered after trial but before judgment unless he establishes an excuse for not having raised the issue in a motion for new trial. *Rinehart v. State,* 234 N.W.2d 649, 656–657 (Iowa 1975).

We hold the other three elements which must be established by a defendant in support of a motion for new trial based on newly discovered evidence must be shown in support of a postconviction application on the same ground. These three elements all relate to the sufficiency of the showing of newly discovered evidence. It is obvious the legislature intended the sufficiency of the showing necessary to obtain a new trial based on newly discovered evidence to be the same whether the ground is raised in a motion for new trial or in a postconviction application.

. . . .

Here it does not appear defendant discovered Carpenter's evidence until after judgment. The first element of this ground for postconviction relief has thus been satisfied. However, whatever the situation regarding the elements of due diligence and probable effect on the result upon retrial, defendant failed to

show this evidence is other than cumulative or impeaching. This failure is sufficient in itself to defeat his application for relief on the ground of newly discovered evidence.

On the basis of the evidence presented here, and having in mind that Lawson has the burden of proof, *State v. Hicks*, 277 N.W.2d 889, 896 (Iowa 1979), we hold that Lawson did not satisfy elements three and four of the newly discovered evidence rule. The trial court therefore properly dismissed his postconviction petition.

AFFIRMED.